## Pennsylvania Railroad Company v. Seiff

Before Hudson, P. J., Henderson and Morrow, JJ.

*Linn V. Phillips,* for plaintiff.

*J. K. Spurgeon,* for defendant.

HENDERSON, J., July 24, 1934.—Two motions on the part of the plaintiff are before the court in banc in this case, one for a new trial, and the other for judgment for the plaintiff n. o. v. The facts in the case were not in dispute, and the trial court directed a verdict in favor of the defendant. The case arises over freight charges on a shipment of grapes from Handford, Cal., to Pittsburgh, Pa., and there reconsigned to Uniontown, Pa. The facts are as follows: On September 28, 1929, S. E. Tharp shipped via the Atchison, Topeka & Santa Fe Railway Company at Handford, Cal., 1,300 lugs of grapes in car PFRD 17870, waybill Handford 434, P. R. R. freight bill no. 50208, weight 31,700 pounds, consigned to Joseph Flaherty Company, Pittsburgh Produce Terminal, Pittsburgh, Pa. The car arrived at the Pittsburgh Produce Terminal, Pittsburgh, Pa., on October 8, 1929, and was properly placed for the said Joseph Flaherty Company that evening, notice of the arrival being given to the consignee. The said Joseph Flaherty Company sold the said car of grapes to one Sam Paskoff while the car of grapes was still in the said terminal at Pittsburgh, Pa., and he sold the said grapes to the defendant on October 10, 1929, for the sum of $975, to be delivered at Uniontown with all freight and charges prepaid, the said

sum including the cost of the grapes, freight, and carrying charges. Joseph Flaherty Company thereupon requested from the plaintiff a reconsignment of the shipment of these grapes to the defendant at Uniontown, Pa., and that reconsignment order was accepted by the plaintiff, freight and charges to be prepaid. The plaintiff then charged upon its books to Joseph Flaherty Company the freight, icing, and demurrage charges incident to the shipment of the car and issued a prepaid freight bill to the defendant, sending a copy thereof to Joseph Flaherty Company and delivering a copy to the defendant through its agent at Uniontown, Pa. The defendant paid to his vendor, Sam Pasakoff, for the car of grapes the said sum of $975 on October 10, 1929, and before doing so knew of the reconsigning order and the prepaid shipment to him at Uniontown, Pa.

The freight on this car, including icing, demurrage, and reconsignment, amounted to $626.50, which is the amount sued for here, and which is the amount charged by the plaintiff to Joseph Flaherty Company. At this time the plaintiff was carrying a large account for similar items against Joseph Flaherty Company. The freight rate on this car was the same to Uniontown, Pa., as to Pittsburgh, Pa. Plaintiff had no dealings with the defendant in connection with this car other than to reconsign it, freight prepaid, to him. The car was delivered to the defendant by the plaintiff on the morning of October 11, 1929, and a prepaid freight bill for the same was also delivered or sent to the defendant by the plaintiff through its agent. The defendant began unloading the car and when practically unloaded, on or about October 14 or 15, 1929, he was notified by the plaintiff company that the freight had not actually been paid and that payment would be expected from him.

On October 16, 1929, the plaintiff, at its Pittsburgh office, changed its waybill or freight bill from a prepaid one to a "freight collect" one. This was done because Joseph Flaherty Company had failed in the meantime.

The shipment was an interstate shipment. No mistake or error was made in charging the freight and expense to Joseph Flaherty Company and issuing a prepaid freight bill to the defendant, but it was done intentionally by the plaintiff in accordance with its custom of charging such items to Joseph Flaherty Company. There is no dispute that the amount billed to Joseph Flaherty Company by the plaintiff was the full tariff rate plus all proper charges.

The contention is that, it being an interstate shipment, the defendant is liable under the acts of Congress for the freight, even though the plaintiff had voluntarily charged Joseph Flaherty Company with the same and accepted the credit of Joseph Flaherty Company as payment. The contention of the defense is that the issuing of credit to Joseph Flaherty Company by the plaintiff, and the fact that the credit was extended to Joseph Flaherty Company and a prepaid freight bill issued in pursuance thereof, constituted payment as far as the defendant was concerned, and he was therefore not liable.

It appears to us that justice requires us to hold in this case that the plaintiff cannot recover under the facts here presented.

The plaintiff issued and delivered to the defendant a prepaid freight bill for the car of grapes in question. This prepaid freight bill was not issued by mistake, but was issued intentionally because the plaintiff had charged to Joseph Flaherty Company the freight and carrying charges. The defendant, knowing that he was getting a prepaid bill delivering the grapes to Uniontown, parted with his money, to wit, the sum of $975, which included the freight and carrying charges, the grapes actually being worth in the neighborhood of $350. We do not believe it was incumbent upon the defendant to ascertain how and in what manner Joseph Flaherty Company paid the plaintiff the freight and carrying charges. It was certainly not incumbent upon him to make inquiry and investigation of the plaintiff, before he paid Pasakoff for

the grapes, including the freight charges, whether or not the freight had actually been paid to the plaintiff in cash. He got the plaintiff's prepaid freight bill certifying the fact of payment. The plaintiff had no dealings with the defendant in connection with the car of grapes, but at the direction of Joseph Flaherty Company it reconsigned and issued its prepaid freight bill. Were there no question of an interstate shipment or of the various acts of Congress relating to railway carriage, a clear case of estoppel would undoubtedly have been made out on the part of the defendant.

The plaintiff, however, contends that those provisions of the Interstate Commerce Act which prohibit carriers from granting special rates or rebates or making use of other devices, for the purpose of receiving from any less compensation for service rendered than it charges or collects from other persons for doing a like service, compel the collection of the admittedly unpaid charge in this case from the defendant regardless of the element of estoppel. In support of this contention counsel for the plaintiff in his brief calls particular attention to the case of New York Central R. R. Co. v. Frank H. Buck Co., 21 Pac. (2d) 667 (Cal. App.). However, an examination of that case shows that the railroad company was authorized by the defendant's agent to deliver the shipment with the bill of lading to Puccia Fruit Company "upon payment of all freight and other charges".

It will be noted that no prepaid freight bill was issued in that case. There the fruit company had a 24-hour credit arrangement with the plaintiff, and it having failed the shipper was held liable. In our judgment the case does not rule the one at bar. No one had paid any money on the statement of the railroad company that the freight was prepaid, but it was to deliver the shipment on payment of all freight and charges. The situation was entirely different from the case at bar, where the defendant, after having knowledge of a reconsignment of the car, freight and charges prepaid, paid the value

of the grapes to the one from whom he had purchased them. He parted with his money on the representation of the plaintiff company that these charges were prepaid.

The plaintiff further relies upon the cases of Central Whse. Co. v. Chicago, Rock Island & Pacific Ry Co., 20 F. (2d.) 828, Western Grain Co. v. St. Louis-San Francisco Ry. Co., 56 F. (2d) 160, and Western & Atlantic R. R. Co. et al. v. Underwood, 281 Fed. 891.

All these cases to some extent support the plaintiff's position, but insofar as they may be said to rule the case at hand we believe that they proceed upon a mistaken view of the purpose of the Interstate Commerce Act. The provisions of that act are intended to prevent any unjust discrimination between shippers, and insofar as the fixing of a rate lower than the tariff rate prescribed by law is concerned, it is undoubtedly true that a carrier cannot, by estoppel or otherwise, place itself in the position of collecting a rate lower than that which it charges other persons for a similar service. There can be no estoppel where a carrier erroneously or intentionally releases the shipment upon payment of a lower rate than the tariff rate, since the consignee, or any other party interested, is conclusively presumed to know what the true tariff rate is and consequently cannot lawfully rely on any representations of the railroad company that the proper rate has been collected in this particular instance. On the other hand, there is nothing in these statutes which prevents a carrier from contracting to look to any particular party in interest in a shipment solely for the collection of the full rate so long as there is no discrimination with the amount of the charge. A consignee is not compelled to accept delivery of goods shipped to him, and no case has been cited to us which holds that a carrier may not lawfully contract with the consignee for the acceptance of a shipment with the understanding that the full tariff rate will be collected from the consignor or some other party in interest. This freedom of contract on the part of the carrier, so long as there is no actual

discrimination in the amount of the rate charged, is clearly recognized in the opinion of Mr. Justice Brandeis in Louisville & Nashville R. R. Co. v. Central Iron & Coal Co., 265 U. S. 59.

Nor are we without authority upon facts almost precisely similar to those of the case at bar. In Cincinnati Northern R. R. Co. v. Beveridge et al., 8 F. (2d) 372 (Dist. Ct., E. D. of Va.), a carload of hay was consigned to the shipper's order, and a prepaid bill of lading was issued to the shipper, who was on the railroad's credit list. The shipper drew a draft on a commission merchant, attaching to the draft a copy of the prepaid bill of lading which had been issued by the railroad company. The commission merchant sold the hay to the defendant and received from the defendant a certified check for the purchase price, with the proceeds of which the draft was paid and the bill of lading presented to the railroad company, which delivered the hay to the defendant. Meanwhile the shipper had failed to make payment for the amount of the credit extended to it, upon which credit the prepaid bill of lading had been issued.

In the suit against the defendant by the railroad company to recover the unpaid freight charges, the court sustained the defendant's position and denied recovery. To the same effect is Davis v. Akron Feed & Milling Co., 296 Fed. 675 (C. C. A. 6). In that case the railroad company delivered a shipment of wheat to the consignee, defendant, representing to it that all freight chargeable against the shipment up to the time of its arrival had been paid. Relying upon this representation the defendant accepted the consignment and settled with the consignor. The railroad company later discovered that all the freight charges had not actually been paid and brought an action against the defendant to recover the delinquency. The district court entered a judgment for the defendant upon an agreed statement of facts, which judgment was affirmed by the circuit court of appeals.

The opinion of the court so well sets forth the reasons

for our holding in this case that we quote at length, as follows:

"The law is well settled that representations or claims made by the carrier as to the correct amount of freight to be charged will not relieve a consignee from the payment of the scheduled rate, for the reason that a shipper or consignee has equal opportunity with a carrier to know the published rate, and he is conclusively presumed to have such knowledge. Railway Co. v. York & Whitney, 256 U. S. 406, 41 Sup. Ct. 509, 65 L. Ed. 1016. It is apparent that any other construction would defeat the purpose of the act, requiring full and exact payment of the published scheduled tariff upon every shipment of freight, and would afford opportunity for collusion and fraud between the carrier and favored shippers, to the injury and prejudice of the public.

"The question here presented, in the absence of any claim or proof of fraud and collusion, must be determined upon wholly different considerations. The consignee in this case had no knowledge, nor had it equal means with the railway company of acquiring knowledge, that the freight from Kansas City to Chicago had not been paid. No circumstance whatever is suggested in the agreed statement of facts that would put the consignee upon inquiry. The railway company knew, or ought to have known, that this freight was not paid, and, when it expressly stated that it had been paid, the consignee relied upon that representation, instead of refusing to accept the consignment until it had made full inquiry with reference to that fact, which inquiry would involve, not only delay, but expense, including demurrage. Nor had the consignee any more reliable source of information than the railway company itself.

"The consignee, at the time these representations were made to it, was in position to protect itself fully in the payment of all freight charges. It was wholly a matter of indifference to it whether these charges were $100 or $200. Whatever freight charges it was required to pay

it could deduct from the purchase price of the merchandise. It is admitted that, if it is now compelled to pay this freight, it cannot recover the same from the consignor and must suffer the loss. If the matter were one wholly between the carrier and the consignee, there would be no question that the carrier's representation would estop it from demanding further payment of freight. While the statute requiring every shipper and consignee of freight to pay the full published scheduled rate is a salutary one for the protection of the public, nevertheless, in construing and enforcing this statute, courts should not wholly ignore private rights. It is equally important that the rights of private individuals should be protected.

"Counsel has not directed our attention to any case in which this exact question has been presented to the Supreme Court, nor does it appear from the investigation we have been able to make that the Supreme Court has held a shipper or consignee of freight liable for the payment of the full published scheduled rate, regardless of misrepresentations by the railway company, upon any theory other than that the shipper and consignee are conclusively presumed to know the published scheduled rate, and therefore may not rely upon the representations made by the carrier. In this case no presumption obtains that the consignee knew that the freight upon this consignment from Kansas City to Chicago had not been paid. That was not a matter of public knowledge. While the question of legal liability is not free from doubt, the equities are clearly with the consignee, and we are not impressed that the public interest demands such construction of the law as would make the consignee suffer a loss due to the fault, negligence, and misrepresentations of the carrier."

To the same effect see also American Express Co. v. Sweeney et al., 283 Fed. 691, and Cleveland, Cincinnati, Chicago & St. Louis Ry. Co. v. McKenzie Lumber Co., 112 Ohio St. 80, 147 N. E. 8.

While we recognize that several cases in the various Federal courts have taken a contrary view of the situation, we are satisfied that the rule more in accord with reason and justice is that adopted by the cases cited immediately above, and in the absence of clear authority upon the point by the highest Federal court we adopt the reasoning of those cases in determining the case at bar.

It would be a matter of injustice to the defendant were he required to pay the freight the second time in this case, and especially so when it was the fault of the plaintiff company, if anyone be at fault, in issuing voluntarily its prepaid freight bill to the defendant. We are of the opinion that as far as the defendant is concerned he is not liable, and that the action of the plaintiff company in issuing the prepaid freight bill under the circumstances here constituted, as far as the defendant was concerned at least, payment.

It thus follows that both the motions should be overruled and denied.

### Order

And now, July 24, 1934, upon and after due consideration, it is ordered that the motion of the plaintiff for a new trial be overruled and denied and a new trial refused, and that the motion of the plaintiff for judgment for the plaintiff n. o. v. be overruled and denied. It is further ordered that judgment be entered for the defendant upon the payment of the jury fee.

Hudson, P. J., dissents.

From Luke H. Frasher, Uniontown.