Marshall, C. J.
 

 This being an interstate shipment, a federal question is presented, involving not only an interpretation of the interstate commerce act but also certain policies which have been declared by the federal courts, and more especially by the Supreme Court of the United States, which policies the courts have found necessary to pursue in carrying out the declared purposes of the act to prevent discrimination among shippers. It involves the interpretation of Sections 2 and 6 of the Commerce Act. Section 2 (41 Stats, at L., 479; Section 7885, Barnes’ Fed. Code; U. S. Comp. St. Ann. 'Supp., 1923, Section 8564) provides in substance that a common carrier shall not directly or indirectly pay, demand, collect, or receive from any person a greater or less compensation for any service in transportation than it charges, demands, collects, or receives from any other person for a like service in transportation. Section 6 (41 Stats, at L., 483; Section 7890, Barnes’ Fed. Code-; U. S. Comp. St. Ann. Supp., 1923, Section 8659) provides in substance that every carrier shall file with the interstate commerce commission schedules of its rates, fares, and charges for transportation between different points on its own route and connecting routes, and further provides that carriers shall not demand, collect, or receive a greater or less or different compensation for any service in transportation than the rates so published. The language of both sections is so broad and com
 
 *87
 
 prehensive as to leave no doubt that all forms of, discrimination are to be scrupulously avoided.
 

 Before the enactment of this law, discrimination was so general, and indulged by so many vices and devices, that the courts very properly conceived the notion that it was necessary to be very strict in requiring carriers to collect freight and demur-rage charges for transportation service. It has therefore been declared, that, even though the agreement between the shipper and consignee requires the shipper to pay the freight, nevertheless an acceptance by the consignee would raise the implication of a contract on the part of the consignee to pay the freight, as between the consignee and the carrier, and it has also been held, even though the agreement between shipper and consignee requires the consignee to pay the freight, that by the mere fact of delivery of the property to the carrier an implication arises against the shipper for payment of the charges. The carrier was therefore in the very comfortable position of being able to collect from either the shipper or consignee as a guaranty that freight charges would be ultimately paid. And all this was deemed essential in order that the carrier might not by any device or by any promise facilitate the evil of discrimination. It has also been declared in numerous cases which need not be reviewed that the published tariffs of rates and charges become a part of the contract of transportation, which shall be read into the contract, and that therefore, if a mistake is made in calculating the charges, the mistake can be corrected and future charges collected, notwithstanding a receipt may have been given in
 
 *88
 
 full, and notwithstanding the fact that in many cases the shipper or consignee may have suffered loss thereby. All this is perfectly sound upon the theory that the published rate is a part of the contract, and a part of the law of the land, and that shippers and consignees are charged with notice and knowledge of the service to be rendered and the charges to be made therefor, as set forth in said published tariffs.
 

 It has also been declared in many cases that a contract between a carrier and shipper for a service not covered by the published tariff is illegal and unenforceable, and that a contract between the carrier and a consignee for compensation less than that stipulated in the tariff does not create an estoppel, because the contract itself is illegal, and therefore no estoppel can be predicated thereon. This is the spirit and the pronouncement of
 
 N. Y. C. & H. R. Rd. Co.
 
 v.
 
 York & Whitney Co.,
 
 256 U. S., 406, 41 S. Ct., 509, 65 L. Ed., 1016;
 
 Keogh
 
 v.
 
 C. & N. W. Ry.,
 
 260 U. S., 156, 43 S. Ct., 47, 67 L. Ed., 183;
 
 P., C., C. & St. L. Ry. Co.
 
 v.
 
 Fink,
 
 250 U. S., 577, 40 S. Ct., 27, 63 L. Ed., 1151;
 
 L. & N. Rd. Co.
 
 v.
 
 Maxwell,
 
 237 U. S., 94, 35 S. Ct., 494, 59 L. Ed., 853, L. R. A., 1915E, 665; and the many cases cited with approval in the last-named case.
 

 Certain principles connected with this subject have become well established, and, having been laid down by the federal courts, in which a federal question was involved, the same should be scrupulously followed by the courts of the several states. Among these principles the following may be enumerated :
 

 The proper and lawful freight and demurrage
 
 *89
 
 charges are those fixed by the filed, posted, and published tariff schedules, and those schedules by implication become a part of the contract of carriage. All shippers and consignees are therefore charged with knowledge of such schedules.
 

 There shall be absolute equality of reasonable rates. No excuse which operates as an evasion may be urged as a defense of a proved violation of a lawful rate.
 

 A carrier cannot contract for any service or stipulate for any compensation which is not provided and published in its tariff, and any such undertaking is unenforceable.
 

 The prohibitions of the statute against unjust discrimination relate, not only to inequality of charges and inequality of facilities, but also to giving of preference by means of consent judgments or the waiver of defenses open to the carrier.
 

 The mere fact of delivery to a consignee, by reason of such consignee being on the credit list of the carrier, does not excuse liability for further charges beyond those collected at the time of delivery; neither is the carrier thereby foreclosed against correcting a mistake.
 

 Ordinarily the acceptance of goods by a consignee raises a rebuttable presumption of title and imposes liability on such consignee for all lawful charges under the interstate commerce act.
 

 The mere fact that a consignee is ignorant of the true tariff rate, or that he was even misled by the carrier’s agents, will not avail as a defense to an action to recover a lawful charge.
 

 The foregoing principles are stated in order that it may be made clear that those who concur in this
 
 *90
 
 decision are not flying in the face of the Interstate Commerce Act, or of the decisions of the United States Supreme Court that have declared the sound judicial policy necessary to be followed in safeguarding’ discrimination on the part of carriers. These principles are stated as a premise to our conclusion that they are not the controlling principles applicable to the proven facts of this controversy. The purport and meaning of the numerous decisions of the federal courts, and of the courts of last resort of the states which have endeavored to follow the federal courts, are that only one rate shall be recognized, to-wit, the lawful published rate, and the underlying principle of those cases where additional charges have been collected after a mistake has been made is that the consignee, or shipper, is presumed to know the law, and is therefore charged with knowledge of the lawful rate. It may therefore be conceded that, even though the consignee had made a remittance to the shipper on the faith of the payment by him to the carrier of a sum less than the lawful charge, and though the payment by him of any additional sum would be a net loss to him of that amount, he would not be heard to complain, because it was his duty to ascertain the lawful rate before making payment.
 

 It may be conceded that the McKenzie Company knew the lawful rate between East St. Louis, 111., and Delaware, Ohio. This record shows that the correct lawful charge for that shipment was $41.54. Ordinarily the McKenzie Company would have been bound to pay that sum, regardless of any contract between the McKenzie Company and the
 
 *91
 
 Gloor-Ortman Company, and regardless of any contract or promises of the Big Pour Railroad.
 

 It clearly appears, however, from this record that McKenzie bought this car from the Gloor-Ortman Company at East St. Louis, 111., without knowledge that the lumber was already on a oar in possession of a carrier, and without knowledge of any accumulated charges, which were almost equal to the value of the lumber. No notice of such fact was given and no circumstances appear in this record which would reasonably put McKenzie upon inquiry. The situation was further aggravated by the carrier having waited until acceptance and unloading before presenting the expense bill to the McKenzie Company. Having purchased a oar of lumber from a dealer at a certain point where delivery could be made by a comparatively short haul, can it be said as matter of law, without any statute to that effect, but merely in pursuit of a declared policy of the courts iu furtherance of prevention of discrimination on the part of carriers, that the McKenzie Company should be charged with notice and knowledge of a very large amount of previous charges against the car, pursuant to other contracts of carriage, all of which was well known to the carrier, but which it failed to bring to the notice of the consignee until after acceptance and unloading? This question must be answered in the light of the further inexcusable fact that the carrier made a mistake in the amount of the total charges, bringing such total beyond the real value of the merchandise, and in the light of the further incomprehensible refusal of the carrier to accept the full value of the merchandise as a partial payment of such concededly unlawful charge.
 

 
 *92
 
 This controversy is fraught with the further distressing circumstance that the agent not only refused to accept the full value of the merchandise as a partial payment, but, when advised that the consignee desired to make settlement at that particular time in order to save a few dollars discount, told the consignee to make payment for the lumber direct to thp shipper and that charges would be collected from that source. It must be conceded that a local agent cannot make a contract for services beyond that covered by the tariff, or agree to a different rate from that stipulated in the tariff schedule, or accept or receipt for an amount less than the legal rate, and this is true not solely because of the want of authority of the local agent but upon the broader ground of illegality, and is therefore forbidden even to the board of directors of the carrier. ' That proposition is well settled by the authorities, and, if that were the pivotal question in this case, our problem would be a simple one. This controversy, upon that particular issue of fact, takes a much wider range, because the act of the local agent was apparently fully ratified by the carrier. In fact, the carrier continued to omit collection from the consignee, and proceeded to endeavor, to collect by legal process both from Quinn and the G-loor-Ortman Company. This action was begun against McKenzie on January 23, 1922, a period of five years and four months after the agent refused to accept the full value of the merchandise as partial payment. The refusal to accept partial payment is wholly inexcusable, because it is well settled by the uniform decisions of a dozen courts that a partial pay
 
 *93
 
 ment or a receipt in full creates no estoppel and does not become a valid defense.
 

 It is said that the carrier has a lien upon the merchandise, and should therefore be permitted to collect from the consignee because of having released that lien. This principle has no application to this controversy, because the McKenzie Company stood ready and offered to make good that lien by depositing with the carrier the full value of the merchandise upon which the lien had theretofore operated.
 

 Having examined all of the cases referred to by counsel for the railroad company, and many others not cited, we are of the opinion that a reversal of this case would establish no principle of preventing discrimination, neither would it serve any purpose whatever, except to make consignees insurers of carriers against loss under any and all circumstances. It is our purpose to give recognition to all the principles established by the Supreme Court- of the United States, and we will not hesitate to apply those principles to facts which are similar or even remotely parallel to the facts before that court in the numerous cases brought to our notice; but we are refusing to apply those principles to the instant case, because we think they can have no just application to the peculiar circumstances herein involved. Those cases do not reach to the extent of making a consignee a guarantor or insurer of claims which accrued prior to the contract of the consignee, where charges are involved which are not brought to his notice, or where circumstances are not shown
 
 *94
 
 which would reasonably place the consignee upon inquiry.
 

 It is further conceded that demurrage charges are collectible from a consignee, and especially all demurrage charges which accrue after the customary free time from delivery of the car to a consignee, but among all the decided cases dealing with the question of demurrage we are not able to find a single one where a consignee has been held liable for demurrage charges accruing while the car is in the control of the shipper. And it is quite certain that no court has decided that a consignee can be held liable for demurrage charges accruing at intermediate points while the car is being shuttled from city to city and being transported by one carrier after another, where the carrier makes no effort to collect either freight or demurrage from intermediate consignees, but, on the other hand, permits all charges to follow, and endeavors to collect from the final consignee, without notice to such consignee and without circumstances calculated to reasonably put him upon inquiry.
 

 This is such an unusual case that we are of the opinion that the perfectly sound principles declared and established by the federal courts and courts of the states upon this subject could not be applied without gross injustice to this defendant in error. While the sum of $41.54 is a perfectly lawful charge against McKenzie, and while he was at the time charged with knowledge of the correctness and fairness of that charge, we are of the opinion that even that sum should not be collected from him at this late date, under the cir
 
 *95
 
 cumstances enumerated in the foregoing statement of facts. There is no suggestion of any effort on the part of the railroad company, or of this consignee, to attempt a discrimination by any device whatever, and it is a clear case of the consignee doing all in its power to facilitate the collection of the lawful rate and being prevented from so doing by the unwarranted act of the carrier itself.
 

 We are of the opinion, therefore, that this feature of the case does not come within the principle of those cases which have declared that no estoppel can arise out of an unlawful contract.
 

 In the case of Galveston,
 
 E. & S. A. Ry. Co.
 
 v.
 
 Lykes Bros.
 
 (D. C.), 294 F., 968, it was held that where a carrier forwarded a shipment over a route carrying a higher rate than another route equally available, and the party settled the disputed question of freight in good faith, but not on the basis of any lawful tariff, and the carrier afterward brought suit to recover at the tariff rate, the carrier could not recover the rate over the route actually used, but only the lower rate which should have been charged on the proper routing. This principle may well be applied to a case where the consignee expected to make payment of a lawful rate from East St. Louis, Ill., to Delaware, Ohio, but not to pay charges on merchandise which hád been shuttled back and forth through several states, before beginning its final journey.
 

 In
 
 American Express Co.
 
 v.
 
 Sweeney
 
 (D. C.), 283 F., 691, strawberries were consigned from. Troy, Kan., to Boston, Mass., but in that case it appears that the car of strawberries had been
 
 *96
 
 originally consigned to Denver, Colo., and that while in transit the shipper had reconsigned the strawberries to Boston, Mass., and the agent of the express company had issued a second receipt merely showing receipt of the strawberries at Troy for shipment to Boston, which receipt was' attached to a draft. The Boston consignee took rip the draft, and it was thereupon held that the transportation company could only hold the consignee at Boston liable for the charges from Troy to Boston, and it was further held that the express company could not profit at the expense of innocent parties by its agent’s misstatement of fact.
 

 The case of
 
 Duncan
 
 v.
 
 United Steel Co.
 
 (D. C.), 244 F., 258, was decided by Westenhaver, J., district judge for the northern district of Ohio, in 1917. The point decided in that case was the well-settled principle that a consignee can be held for freight charges, notwithstanding the fact that the consignor is also liable both under the law and by express promise to pay. In deciding the case, however, the district judge made the following observation:
 

 “If the bill of lading had recited that all freight charges had been prepaid, and the defendant-had made payment in full to the seller relying on this recital, and without knowing or having knowledge of the facts imputing to it notice that the recital of payment was erroneous, the plaintiff might then be estopped to assert the contrary.”
 

 The case of
 
 Davis, Dir. Gen.,
 
 v.
 
 Akron Feed & Milling Co.,
 
 296 Fed., 675, was decided by the Cir
 
 *97
 
 cuit Court of Appeals of the Sixth. Circuit, which holds:
 

 “ Where wheat, which had been reconsigned several times, was sold to defendant f. o. b. cars in defendant’s oity, and carrier erroneously told defendant that the freight had been paid to a certain point, and defendant, paid the freight charges from that point, and paid seller the balance of the purchase price after deducting the freight paid,
 
 held,
 
 that carrier is estopped from demanding further payment of freight by defendant.”
 

 The facts of that case were in all essential respects parallel to the .facts of the instant case, and the opinion of the court gives, full recognition to the well-established principle that a shipper or consignee has equal opportunity with a carrier to know the published rate, and that he is conclusively presumed to have such knowledge, and nevertheless distinguishes the case and holds that by the facts of that case an estoppel may be created.
 

 The foregoing cases were decided by federal judges and are valuable because they indicate that federal judges, who may be presumed to be more conversant with the principles and policies of the Interstate Commerce Act, are of the opinion that in eases where the illegality of a contract is not involved, and where there is no actual attempt at discrimination, an estoppel might nevertheless be created.
 

 The case of
 
 L. & N. Rd. Go.
 
 v.
 
 Central Iron & Coal Co.,
 
 265 U. S., 59, 44 S. Ct., 441, 68 L. Ed., 900, decided May 5, 1924, is one of the recent cases decided by the Supreme Court of the United States. That was an action against the shipper.
 
 *98
 
 The contract between the shipper and the consignee required payment of freight, to be made by the consignee. Upon delivery of the freight an incorrect bill was presented which was several thousand dollars less than the freight legally payable. The undercharge was not discovered until about three years later, when demand was made upon the shipper. On suit brought judgment was entered in favor of the shipper. The opinion of the court announced by Justice Brandéis declares:
 

 “But delivery of goods to a carrier for shipment does not, under the Interstate Commerce Act, impose upon a shipper an absolute obligation to pay the freight charges. The tariff did not provide when or by whom the payment should be made. As to these matters carrier and shipper were left free to contract, subject to the rule which prohibits dis crimination. ’ ’
 

 After reciting the different agreements which may be made between shipper and consignee, and between carrier and shipper, the opinion of the court further states:
 

 “We must therefore determine what promise, if any, to pay freight charges, was, in fact, made by the Central Company [the shipper].'
 

 “To ascertain what contract was entered into we loot primarily to the bills of lading, bearing in mind that the instrument serves both as a receipt and as a contract.”
 

 The opinion then proceeds to recite, not only the various things which might have been agreed to, but proceeds to recite at some length the actual provisions of the contract, as set forth in
 
 *99
 
 the bill of lading, and further proceeds to- draw proper conclusions therefrom, as follows:
 

 “On these facts, the trial court was justified in finding that the Central Company did not assume the primary obligation to pay the freight charges.
 

 “It is urged that, if the Central Company was not under a primary obligation to pay the freight charges, it was secondarily liable, because collection from the Smelters Corporation [the consignee] of the balance remaining due had become impossible before the undercharge was discovered. But the trial judge was. not compelled so to find. There was evidence that such collection had not become impossible. Confessedly no effort was made to collect from it. Nor was any effort made to collect from Tutwiler & Brooks [the real owners of the merchandise at the time of shipment]. Moreover, if a secondary obligation of the Central Company was to be implied from the fact of its causing the coke to be received for transportation, the promise was not necessarily one to pay at any time any freight charges which the carrier might find it impossible to collect from the consignee or his assign. The court might have concluded that it guaranteed merely that the consignee or his assign would accept the shipment.”
 

 All of the courts in above case having refused to hold the shipper liable, it seems clearly established as the last word of the Supreme Court of the United 'States that neither shippers nor consignees are to be made guarantors and insurers
 
 *100
 
 of carriers against loss under any and all circumstances.
 

 It seems to be further clearly established by that case that contracts of carriers which are not inherently illegal, and which have been observed by the other party to the contract, may become the basis of an estoppel where the other party to the contract has acted in such manner as will result in loss to it.
 

 The primary purpose of the Interstate Commerce Act was to compel fair dealing with the shipper on the part of carriers, and to prevent discrimination against him and preferences to others. That is to say, it was designed to prevent oppression, and we are unwilling in furtherance of that beneficent purpose to go to the length of visiting oppression upon a consignee by compelling the carrier to violate a contract which we conceive to be legal. The contract may have been unwise, and it may have resulted in loss to the carrier, but its unwisdom should not be visited upon the consignee, who has placed himself in a situation where his loss cannot be retrieved, if compelled to respond in this case. The agent may not have been authorized to make the contract, but his act was clearly ratified and recognized by his principal, for a period of more than five years.
 

 Further referring to the question of demurrage charges, we are of the opinion that the same are primarily chargeable only against the person by whose fault they accrue, and no decision we are able to find decides the contrary. In the instant pase we are not required to go this length, be
 
 *101
 
 cause McKenzie was willing and ready to pay to the limit of his interest in the merchandise, and in a sum which now appears to have been more than the amount required.
 

 We are therefore of the opinion that under the circumstances of this case there should he no recovery against the McKenzie Company even for the charges from East St. Louis, 111., to Delaware, Ohio, and that the judgments of the lower courts should therefore he affirmed.
 

 Judgment affirmed.
 

 Allen, Kinkade and Robinson, JJ., concur.
 

 Matthias, J., dissents.