**SOUTHERN RAILWAY COMPANY,**
Plaintiff,

v.

**LOUISVILLE AND NASHVILLE RAILROAD COMPANY, Defendant.**

Civ. No. 3700.

United States District Court
W. D. Kentucky,
Louisville Division.
June 29, 1960.

Albert F. Reutlinger, Louisville, Ky., for plaintiff.

Robert P. Hobson, Joseph L. Lenihan, Louisville, Ky., for defendant.

BROOKS, District Judge.

1. By this action, plaintiff (herein called Southern) seeks to recover of the defendant (herein called L&N) more than $157,000 for placing cars of L&N at, or removing such cars from, the plant of General Mills, Inc., located on Farmington Avenue in Louisville, Kentucky, during the period June 27, 1955, through August 31, 1959. Southern rests its claim upon a certain tariff (and reissues thereof) which it published and which undertakes to assess a charge on such cars as are "interchanged" between the Southern and L&N on a track adjacent to the General Mills plant.

2. L&N denies liability to Southern for the amount claimed and alleges that switching service to the General Mills plant is the subject of a contract between the two railroad companies and General Mills, under which the plant was to be served by the two railroads jointly and the two railroads were to alternate the switching service on an annual basis; and that Southern breached the contract and locked the L&N out of the plant, thereby preventing the L&N from performing its part of the service. The L&N, in its answer and at the trial, expressed its willingness to perform the contract and to switch the plant for a period of time equal to that during which L&N has been excluded from the plant by Southern and thus repay Southern in kind for the services it has performed.

3. The L&N, in its answer, also pleads that Southern is estopped to

charge the L&N any sum for switching L&N cars to and from the plant, alleges that the tariffs are not a proper issue in the case and, in any event, are inapplicable and unreasonable, and by counterclaim seeks a declaratory judgment as to the existence and validity of the contract covering service to the plant. It also seeks recovery of $2,109.58 which it claims it paid to the Southern in error.

4. The case was tried to the court without a jury on December 3 and 4, 1959, and while the Southern confined its proof in chief to the tariff issue, the L&N put in much testimony and numerous documents in support of its case, the transcript of testimony numbering more than 500 pages.

5. The evidence shows without contradiction that beginning in 1951 there were extended negotiations by and among General Mills, L&N and Southern concerning the establishment by General Mills of a new plant at Louisville. One of the major requirements of General Mills was that the new plant site be served by both the L&N and the Southern. The site on Farmington Avenue was eventually selected by General Mills because it had this attribute, and General Mills' Director of Traffic, A. M. Thomas, testified at the trial that his Company paid a premium for the land because of this feature, saying that there are not many sites in the Louisville area that can be reached by both the L&N and the Southern.

6. The plant site on Farmington Avenue lies east of Floyd Street and north of Farmington Avenue. Between Floyd Street and the plant site there now is, and was in 1951, an industrial-lead track of the L&N, and between the L&N track and the plant site there was in 1951 a track owned by the Southern which had long been unused if not completely abandoned, known as the Highland Park Spur. The Highland Park Spur has since been rehabilitated by Southern and extends to near the north edge of Farmington Avenue.

7. In order to make the plant site available to, and suitable for use by, General Mills a number of ancillary transactions had to be accomplished. For example, L&N had a right of way through the plant site, and it quitclaimed that right of way to General Mills. L&N acquired certain parcels of land from adjacent property owners so that the necessary track construction of the two carriers to serve the plant could be accomplished, and General Mills made an exchange of property with another adjacent property owner so that the connecting track might be built into the plant site.

8. With the definite agreement and understanding among all of the parties that the new plant would be jointly served by the two railroads and switched by them on an alternate yearly basis, General Mills erected its new plant, spending approximately $1½ million on the project. L&N and Southern spend about $15,000 each in constructing their respective track connections, and General Mills spent about $22,000 for its plant tracks, which were constructed for it by L&N.

9. During the preliminary negotiations, a number of different plans were considered for connecting the tracks of the two railroad companies with the plant tracks. The first plan called for the plant tracks to turn out of the L&N track and for the Southern to use the L&N track to reach the plant. The second plan also contemplated a direct connection between the L&N track and the plant tracks. The third plan, which was finally adopted because it afforded the two railroads the greatest ease of operation, provided for the plant tracks to connect with the Southern track and for the L&N to connect its track to the Southern's and use a small portion of the Southern's track to reach the plant.

10. Construction of the plant was started in 1953, and when L&N on May 4, 1953, attempted to make a delivery of construction materials to the plant, it found the switch from the L&N track to the Southern track spiked against it. Upon remonstrance by the L&N to the Southern, the spike was removed and

the L&N enjoyed uninterrupted access to the plant until September 3, 1953, on which date Southern's Superintendent telegraphed L&N's Superintendent that the switch would again be spiked. Protest by the L&N again resulted in the removal of the spike. The L&N again encountered difficulty on November 30, 1953, on which date the Southern placed a lock on the switch. Once again, the L&N's protests resulted in the opening of the switch.

11. The General Mills plant began operations in the latter part of 1953, and the L&N and the Southern agreed that while the formal contract was being prepared, switching for the plant should be alternated between L&N and Southern on a monthly basis. Accordingly, L&N did all of the switching for both L&N and Southern during the month of January, 1954, Southern did all of the switching for both carriers during February, 1954, the L&N in March, the Southern in April, and the L&N in May of 1954, until May 21, 1954, when Southern again locked the switch against the L&N. The switch has remained locked since that day, the L&N thereby being denied access to the plant.

12. By stipulation made in open court, Southern and L&N agreed that the contract which appears at pages 214–236 of the transcript, although never formally executed, constitutes the agreement by and among the parties. That contract is a 3-way agreement between L&N, Southern and General Mills. It recites that General Mills selected the Farmington Avenue plant site on the assurances of the two carriers "that it would be served by both of them, with all of the plant's switching to be handled by one railroad at a time on an alternate yearly basis." In paragraph 2 of the contract, Southern grants the L&N the right to use certain of its tracks to reach the General Mills plant, and the L&N grants the Southern similar rights on certain of its tracks and, in addition, grants Southern the right to use the L&N's track to serve the plants of two adjacent industries, Steel Fabricators,

Inc., and Steel Suppliers, Inc. In Paragraph 4 each carrier agrees to maintain its tracks which are to be jointly used, in good condition, at its own expense. Paragraph 5 provides that L&N and Southern "shall each have equal rights with the other in and to the joint use of said tracks of the Southern Company and the Louisville Company, respectively, so to be jointly used hereunder," as well as the General Mills tracks. Paragraph 10 of the contract provides that inasmuch as the industry desires that the Southern and L&N alternate in the performance of switching service to the plant on an annual basis, "it is hereby agreed that the Southern Company shall perform such switching for itself and the Louisville Company during the first years of the life of this agreement, and the Louisville Company shall perform such switching for itself and the Southern Company during the second year of the life of this agreement, and thereafter such switching shall be rotated by the Southern Company and the Louisville Company in the order aforementioned for like periods of time during the life of this agreement." Paragraph 15 of the contract provides that, except as to the alternate annual switching arrangement, the contract shall take effect as of April 1, 1954, and that the alternate annual switching arrangement shall become effective June 1, 1954. The reason for the exception as to the annual switching was that when the contract was being placed in final form in May of 1954, L&N was performing the switching during that month under the interim monthly arrangement.

13. As an excuse for its failure to perform the contract which it admits having entered into, Southern alleges that it was impossible for it to perform such contract. Specifically, it alleges that the Southern, instead of performing all of its own switching service at Louisville, employs the Kentucky & Indiana Terminal Railroad Company (herein called K&I) to do some of such work, including switching service to the General Mills plant; that the K&I is owned by

the Monon, the B&O and Southern one-third each; that it pays the K&I on "an engine hour basis" (not a tariff basis) for doing the work; that by contract the K&I has the right to perform substantially all of Southern's switching work at Louisville; that employees of the K&I threatened to strike if the L&N were allowed to switch the General Mills plant on an alternating basis; and that after the threat of strike, the K&I locked the Southern's switch from the L&N's track to the Southern's track thus denying the L&N access to the General Mills plant.

14. By interrogatories served October 2, 1959, the L&N requested the Southern to file a copy of "the contract alleged in paragraph 4(a) of the Reply to give the K&I the right to perform substantially all of Southern's switching operations in Louisville." In its response the Southern filed "written memoranda which constitute the contract in question." At the trial Southern introduced the following as constituting the contract, these being the "written memoranda" referred to:

(a) An agreement dated January 3, 1911, between the B&O, the Monon and the Southern and certain subsidiaries, on the one hand, and the K&I, on the other, concerning operations on property of the K&I. The Court finds as a fact that this contract did not relate to any work to be performed by the K&I off the property of the K&I, e. g., on the tracts of the Southern, and does not establish that Southern is obligated to use the K&I to perform its switching service at the General Mills plant, which is located on tracks owned by the Southern.

(b) A booklet bearing on its cover page the inscription "Kentucky & Indiana Terminal Railroad Company Rules and Regulations Governing the Handling of Switching and the Counting of Car Movements, effective July 1, 1914." The Court finds as a fact that this booklet is not and does not purport to be a contract between the K&I and the Southern. It is a book of instructions issued "by order of the Board of Directors" of the K&I and is apparently directed to accounting employees of the K&I and merely tells them how various items of expense are to be charged.

(c) A booklet bearing on its cover page the inscription "Kentucky & Indiana Terminal Railroad Company 'Pink Book', Rules and Regulations Governing the Handling of Switching and the Counting of Car Movements, Effective July 1, 1914 (revised to July 1, 1949)." The Court finds as a fact that this booklet is not and does not purport to be a contract between the K&I and Southern. It appears to be merely a revision of the document referred to in (b) above.

(d) A map bearing the legend "K. & I. T. R. R. Co. Accounting Blocks", dated September 2, 1952. The Court finds as a fact that this map is not and does not purport to be a contract between the K &I and the Southern.

(e) A copy of a letter dated April 25, 1907, from the General Superintendent of the Southern Railway Company St. Louis-Louisville lines to the Manager of the K. & I. B. & R. R. Co. (a different company from the K&I) which says that "the K. & I. B. & R. R. Co. is to take over the work of switching south of Market Street, Louisville", and that the Southern is to be billed for 50% of the actual cost. The Court finds as a fact that this letter did not constitute a contract between the Southern and the K&I or the K. & I. B. & R. R. Co., and that nothing therein obligates Southern to allow the K&I to perform switching at the General Mills plant.

15. Reference was made in the testimony to a labor agreement between the K&I and some of its employees, but Southern did not introduce a copy of the agreement in evidence. The head of the K&I union testified, however, that he knew of no contract between the K&I union and the Southern which says that the K&I union is entitled to switch the Southern's tracks.

16. The General Mills plant was intended to be, and is, a "joint" industry, that is, an industry served directly by

both the L&N and the Southern. In this connection, by a tariff effective August 10, 1953, almost a year before it was locked out of the plant, the L&N listed the General Mills plant as being an industry directly served by the L&N. The effect of this publication was to obligate the L&N to handle cars to and from the General Mills plant without charging General Mills a switching charge therefor.

17. After the Southern had locked the switch against the L&N on May 21, 1954, and had thus excluded the L&N from the General Mills plant, the L&N's President became concerned that because the L&N was not able to enter the plant, Southern might try to collect from General Mills a switching charge on the L&N shipments. To protect General Mills against such a claim, the L&N's President suggested to the L&N Traffic Department that a switching charge should be published by Southern. By reason of the foregoing, in the latter part of October, 1954, one of L&N's traffic officers, Mr. Williams, called the Executive General Agent of the Southern at Louisville and told him that the L&N would be willing to pay the Southern "to do the work for us on a temporary basis until such time as the larger question is settled." However, the Traffic Department of the L&N thereafter obtained a ruling from the L&N's Law Department that no such publication was required, and Mr. Williams notified Southern that L&N would not pay a switching charge. This notification was given February 1, 1955. Southern did not publish the tariff upon which it relies in this case until June 27, 1955, about five months later.

18. The provision of its tariff upon which Southern relies purports to assess a switching charge "on traffic received from or delivered to L&NRR at Louisville, Ky., interchanged with the L&NRR at Highland Spur which crosses Boxley and Farmington Avenues." The Court finds as a fact that cars are not "interchanged" between the Southern and the L&N at the point in question.

19. Interchange occurs when a car passes from the account of one railroad into the account of another. Under Car Service Rule 7 interchange is accomplished only by the agreement of the carriers involved, and the L&N's Superintendent of Car Service notified the Southern's Superintendent of Car Service on July 20, 1954, that the Farmington Avenue location is not an interchange point between the L&N and Southern; and the L&N has never altered its position in this respect. Cars of L&N traffic destined to or from the General Mills plant stay in the account of the L&N and are not taken into the account of the Southern when Southern moves the cars through the switch from the L&N tract and into or out of the plant. The L&N continues to pay per diem rental on the cars all of the time that the cars are in the General Mills plant, and it continues to be responsible for the safety of the cars, no interchange reports are executed, and General Mills maintains separate demurrage accounts with the L&N for its cars and the Southern for its cars.

20. The Southern contends that 21st Revised Page 99 of L&N's tariff 24–C, and subsequent reissues of that page, require the L&N to "absorb" the Southern's switching charge. The 21st Revised Page 99 was issued April 30, 1954, prior to the lockout of May 21, 1954, and was not, therefore, directed to the present situation. Moreover, the page in question provides for the absorption of only "the lawfully published switching charge" of the Southern. Southern's tariff witness made a distinction between rates which are "lawfully published" and those which are only "legally published", saying of Southern's tariffs: "I didn't say they were lawfully published. I said they were legally published." That the L&N's tariff was not directed to the present situation is evident from the fact that the tariff provides that there is no direct connection between the L&N and the Southern at Louisville and that interchange between them is accomplished via the K&I as an intermediate carrier, the

point of interchange between the K&I and the L&N being at 7th & Magnolia Streets.

21. The General Mills plant on Farmington Avenue is only one of many points served jointly by Southern and L&N, and many of these are switched on an alternating basis. For example, the Gold Proof Elevator Company plant at Louisville is located on a track known as the Hub Track which is used by both the L&N and the Southern, and the L&N switches the plant during the day and the K&I switches it for the Southern during the night. Another example is the plant of Monsanto Chemical Company at Anniston, Alabama. By a contract entered into between L&N and Southern in June of 1935, it is provided that the switching to the plant shall be performed by the two carriers on an alternate monthly basis. No switching charge is collected by one railroad against the other in these instances.

22. In the routine of settling its accounts, L&N on or about November 29, 1957, paid to the Southern, through error, the sum of $2,109.58. After payment, L&N inquired of Southern as to what the item covered, and L&N then learned for the first time that it represented the amount claimed by Southern for handling L&N cars to and from the General Mills plant during October, 1957.

### Conclusions of Law

1. The Court has jurisdiction of the parties and the subject matter of the action.

2. Southern and L&N are each bound by the contract asserted in the L&N's answer and counterclaim and introduced in evidence.

3. Southern has not shown that it was obligated by contract to allow K&I to perform its switching service at the General Mills plant. Nor does the threatened strike against the K&I excuse Southern's nonperformance. Southern is not excused from performing the contract by impossibility of performance. The Fritz-Rumer-Cooke Co. v. United States, 6 Cir., 279 F.2d 200,

Raisor v. Jackson, 1950, 311 Ky. 803, 225 S.W.2d 657, 659; Mid-Continent Petroleum Corp. v. Barrett, 1944, 297 Ky. 709, 181 S.W.2d 60, 62; Runyon v. Culver, 1916, 168 Ky. 45, 181 S.W. 640, L.R.A.1916F, 3.

4. Under Section 1(18) of the Interstate Commerce Act (49 U.S.C.A. § 1(18)), particularly the last sentence thereof, the L&N and Southern were free to enter into a contract for the joint use of the tracks here involved without the approval of the Interstate Commerce Commission. They were also free to provide, as they did provide, for the performance of switching service on the basis set out in the contract, that is, on an alternating annual basis without a charge being made by Southern against L&N or by L&N against Southern, and were not required to publish charges in their tariffs for such switching service. Terminal Allowances at Minnesota Transfer (1946), 268 I.C.C. 5, 9–11; Houston Belt & Term. Ry. Co. Control (1950), 275 I.C.C. 289, 303–304; United States v. Union Pacific R. Co. (1939), Equity No. 1409, U.S.D.C.D.Nebr., Omaha Div. (not reported); Dixie Cotton Oil Co. v. St. Louis, I. M. & S. Ry. Co. (1913), 27 I.C.C. 295, 297.

5. The right which L&N obtained under the contract to operate over Southern's track so as to reach the General Mills plant had the effect of making the General Mills plant an industry on the L&N, General Mills, Inc. v. Chicago, M. St. P. & P. R. Co. (1950), 278 I.C.C. 591, 595–596, Dixie Cotton Oil Co. v. St. Louis, I. M. & S. Ry. Co. (1913), 27 I.C.C. 295, and the line-haul rates covering the movement of L&N traffic to the General Mills plant at Louisville include the placing of the cars at the General Mills plant without the payment of an additional switching charge, The Los Angeles Switching Case, Interstate Commerce Commission v. Atchison, T. & S. F. R. Co., 234 U.S. 294, 309, 311, 34 S.Ct. 814, 58 L.Ed. 1319; Dixie Cotton Oil Co. v. St. Louis, I. M. & S. Ry. Co. (1913), 27 I.C.C. 295; Car Spotting Charges (1915), 34 I.C.C. 609, 616.

6. In placing cars at the General Mills plant for the L&N, Southern is merely the agent of L&N, not a connecting carrier, Terminal Allowances at Minnesota Transfer (1946), 268 I.C.C. 5; United States v. Union Pacific R. Co. (1939), Equity No. 1409, U.S.D.C.D. Nebr., Omaha Div. (not reported); Houston Belt & Term. Ry. Co. Control (1950), 275 I.C.C. 289.

7. The Southern tariff upon which Southern relies is inapplicable to the handling of cars of L&N traffic to and from the General Mills plant, for the reason that the handling of such cars is governed by the contract between the two carriers and General Mills, and Southern's action in attempting to publish a tariff charge was in violation of the contract and therefore wrongful. Southern is not entitled to collect its tariff charges and thereby to profit from its wrongdoing. Davis v. Akron Feed & Milling Co., 6 Cir., 1924, 296 F. 675, adhered to and reaffirmed United States v. Mason & Dixon Lines, Inc., 6 Cir., 1955, 222 F.2d 646, 649–650; American Express Co. v. Sweeney, D.C.D.Mass. 1922, 283 F. 691; Cleveland, C., C. & St. L. Ry. Co. v. McKenzie Lumber Co., 1925, 112 Ohio St. 80, 147 N.E. 8, 14; Griffin Grocery Co. v. Pennsylvania R. Co., 1956, 93 Ga.App. 546, 92 S.E.2d 254, 256; Southern Pacific Co. v. Valley Frosted Foods Co., 1955, 178 Pa.Super. 217, 116 A.2d 70, 73; Houston & T. C. R. Co. v. Lee County Produce Co., D.C. S.D.Tex.1926, 14 F.2d 145, 147.

8. Even if the matter were not governed by the contract, Southern's tariff would be inapplicable for the reason that the tariff, by its terms, applies only to cars which are "interchanged" between the two carriers, and no such interchange occurs with respect to the cars in question. Section 3(4) of the Interstate Commerce Act, 49 U.S.C.A. § 3(4); City of Chicago v. Atchison, T. & S. F. Ry. Co., 1958, 357 U.S. 77, 85–86, 78 S.Ct. 1063, 2 L.Ed.2d 1174.

9. The L&N's tariff, which is of equal dignity with that of the Southern, obligates the L&N to absorb only those switching charges of Southern which are "lawfully published". A "lawful" rate is to be distinguished from a rate which is merely "legal". Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 1932, 284 U.S. 370, 384, 52 S.Ct. 183, 76 L.Ed. 348; Arkansas Fuel Co. v. C., M. & St. P. Ry. Co. (1909), 16 I.C.C. 95, 97; Lay Fish Co. v. Director General (1923), 80 I.C.C. 4, 5. In view of Southern's contract obligation to L&N and General Mills that the switching would be performed on an alternating basis, without monetary payment between the carriers but only service in kind, Southern's publication of the tariff charges was without warrant in law, and such charges cannot be regarded as "lawfully published" charges.

10. Southern is estopped to deny the L&N the right to switch cars into and out of the General Mills plant in the manner agreed upon by the parties. It is estopped to deny L&N access to or from the General Mills plant. It is estopped to charge the L&N for switching performed by the Southern for the L&N of cars destined to or from the General Mills plant, so long as L&N performs its obligations under the contract referred to in Conclusion 2 hereof by performing or standing ready and willing to perform the alternate switching arrangement referred to in the contract between the parties, and Southern is further estopped to collect from the L&N any such charge for which recovery is sought by the Southern in this case. Davis v. Akron Feed & Milling Co., 6 Cir., 1924, 296 F. 675, adhered to and reaffirmed United States v. Mason & Dixon Lines, Inc., 6 Cir., 1955, 222 F.2d 646, 649–650; American Express Co. v. Sweeney, D.C.D.Mass.1922, 283 F. 691; Cleveland, C. C. & St. L. Ry. Co. v. McKenzie Lumber Co., 1925, 112 Ohio St. 80, 147 N.E. 8, 13; Griffin Grocery Co. v. Pennsylvania R. Co., 1956, 93 Ga.App. 546, 92 S.E.2d 254, 256; Southern Pacific Co. v. Valley Frosted Foods Co., 1955, 178 Pa.Super. 217, 116 A.2d 70, 73.

11. Southern was not entitled to receive or retain the sum of $2,109.58 referred to in Finding 22, nor any part of such sum, because of the existence of the contract between General Mills, Southern and L&N as herein expressly found, and, therefore, L&N is entitled to recover of Southern $2,109.58, with interest at the rate of 6% per annum from December 1, 1957, until paid.

Counsel for defendant will tender judgment on notice.