**UNITED STATES of America,**
**Plaintiff,**

v.

**TERMINAL RAILROAD ASSOCIATION**
**OF ST. LOUIS, Defendant.**

Civ. Nos. 66-25, 66-67, 66-79
(Consolidated as Civ. No. 66-25).

United States District Court
E. D. Illinois.

May 24, 1967.

Joel A. Kunin, Asst. U. S. Atty., East St. Louis, Ill., and D. F. Billet, Regional Atty., Chicago, Ill., for plaintiff.

Norman J. Gundlach, Roberts, Gundlach, Lee & Stubbs, East St. Louis, Ill., for defendant.

JUERGENS, Chief Judge.

MEMORANDUM AND ORDER

These three cases have been consolidated for hearing and are brought under the provisions of Title 45 U.S.C.A. Sections 1–16, inclusive, commonly referred to as the Safety Appliance Act.

Case No. 66–25 contains twenty causes of action; twelve charge violation of 49 CFR 132.13(e) (1) and 49 CFR 132.12 and are in dispute.

Action No. 66–67 consists of five causes of action—one being admitted by the defendant, and the remaining four are in dispute and charge violations of 49 CFR 132.12.

Action 66–79 consists of one cause of action, a violation of 49 CFR 132.12.

49 CFR 132.12 provides in pertinent parts as follows:

"All trains must be given inspection and test as specified by paragraphs (a) to (h) of this section at points: (1) Where a train is originally made up (Initial Terminal); (2) Where train consist is changed other than by adding or removing a solid block of cars and train brake system remains charged; (3) *Where train is received in interchange.*" (Emphasis Supplied).

49 CFR 132.13 provides that transfer trains in yard train movements not exceeding 20 miles must have the air brake hose coupled between all cars and after the brake system is charged to not less than 60 pounds a 15 pound service brake pipe reduction must be made to determine that the brakes are applied on each car.

The gravamen involves movements of New York Central trains to the lower yard in East St. Louis, Illinois, by New York Central crews which were then replaced by Terminal Railroad Association crews. In the one instance, the train continued to the Missouri Pacific or Frisco lines in St. Louis, Missouri, and in the other case continued to the Missouri Pacific yards in Dupo, Illinois. Another movement involved a train consist which was received by Terminal Railroad at Missouri Pacific's yard in Dupo, Illinois. There the locomotive and caboose of Missouri Pacific were cut off and replaced by TRRA locomotive and caboose. The TRRA crew made the brake test required by 49 CFR 132.13(c) (1). The train was then moved over TRRA tracks and delivered to the Pennsylvania and B. & O. railroads.

Generally stated, the facts surrounding the New York Central movements are as follows: The New York Central trains originate in Indianapolis, Indiana. The train is there given the full initial terminal brake test prescribed by 49 CFR 132.12. It is then moved in a solid block destined for the Missouri Pacific yards or Frisco yards in St. Louis in one instance and the Missouri Pacific yards in Dupo, Illinois in the other instance. After the train is made up and the brake test made, it then moves from Indianapolis, Indiana to Mattoon, Illinois, where a crew change occurs—the Indianapolis crew being replaced by a crew from Mattoon, both employees of the New York Central. No brake test is made, nor is any required. The train bound for St. Louis then proceeds to East St. Louis, and upon reaching the New York Central yard limits, the road crew is relieved and replaced by a yard crew, all New York Central employees. The train then proceeds to the TRRA rails in East St. Louis, where the New York Central crew is relieved by a TRRA crew and the train, remaining intact, proceeds to its destination in St. Louis. The New York Central road crew on the train movement from Indianapolis to the Missouri Pacific yards in Dupo is replaced at the TRRA rails by a TRRA crew which moves the train to Dupo.

In each instance the New York Central trains are made up in Indianapolis and are destined for either St. Louis or Dupo, Illinois. When a crew change is completed by New York Central crews, no test is made nor is one required. The government contends that when the crew change is from New York Central crew to TRRA crew then the power brake test

prescribed by 49 CFR 132.12 is required; its position being that when the train crews are changed at the boundary lines between the New York Central and the TRRA, the train in question is received in interchange as that term is used in 49 CFR 132.12. The regulations do not define "interchange"; however, the government points to a definition of interchange as given in a declaratory order entered by the Interstate Commerce Commission on the 16th day of March, 1965. By this order the Commission held that when two railroads join in through-train operation without change of power, caboose, or other train consists, at their boundary, changing only crew at boundary, the boundary is the place where the train is received in interchange as that term is used in 49 CFR 132.12, because at that point the use or haul on the line of one carrier ceases and the other commences.

Testimony established that in 1964 the New York Central began assembling entire trains in Indianapolis destined for St. Louis and Dupo to be delivered from Indianapolis to the destination by the New York Central crews, but that union rules required TRRA crews to move all movements on TRRA tracks and that it was thus necessary to change the crews from New York Central to TRRA personnel to meet the union requirements.

The question the court must determine with regard to the New York Central movements is whether or not an interchange did in fact occur when the New York Central crew was replaced by the TRRA crew—the entire consist of the train otherwise remaining intact.

In Southern Railway Co. v. Louisville and Nashville R. Co., D.C., 185 F.Supp. 645, the term "interchange" was defined. It was there stated:

"Interchange occurs when a car passes from the account of one railroad into the account of another. Under Car Service Rule 7 interchange is accomplished only by the agreement of the carriers involved, and the L & N's Superintendent of Car Service no-

tified the Southern's Superintendent of Car Service on July 20, 1954, that the Farmington Avenue location is not an interchange point between the L & N and Southern; and the L & N has never altered its position in this respect. Cars of L & N traffic destined to or from the General Mills plant stay in the account of the L & N and are not taken into the account of the Southern when Southern moves the cars through the switch from the L & N tract and into or out of the plant. The L & N continues to pay per diem rental on the cars all of the time that the cars are in the General Mills plant, and it continues to be responsible for the safety of the cars, no interchange reports are executed, and General Mills maintains separate demurrage accounts with the L & N for its cars and the Southern for its cars."

The term "interchange" was also defined in Chicage & North Western Ry. Co. v. Chicago, R. I. & P. R. Co., D.C., 179 F.Supp. 33, wherein it was stated:

"It is undisputed that the plaintiff and the defendant were both parties to the rules of the Association of American Railroads and that both had agreed to be bound by those rules. The defendant relies upon certain of those rules. Rule 7 of the Association of American Railroads' Code of Car Service Rules provides as follows:

'Cars shall be considered as having been delivered to a connecting railroad when placed upon the track agreed upon and designated as the interchange track for such deliveries, accompanied or preceded by necessary data for forwarding and to insure delivery, and accepted by the car inspector of the receiving road. Unless otherwise arranged between the roads concerned the receiving road shall be responsible for the cars, contents and per diem after receipt of the necessary data for forwarding and to insure delivery, and until they have been accepted by its inspector or returned to the delivering road.' "

Title 45 U.S.C.A. § 9 provides in pertinent parts as follows:

"Whenever, as provided in sections 1–7 of this title, any train is operated with power or train brakes * * *; and, to more fully carry into effect the objects of said sections, the Interstate Commerce Commission may, from time to time, after full hearing, increase the minimum percentage of cars in any train required to be operated with power or train brakes which must have their brakes used and operated as aforesaid. One hundred and twenty days after the date of enactment of the Power or Train Brakes Safety Appliance Act of 1958, the Interstate Commerce Commission shall adopt and put into effect the rules, standards, and instructions of the Association of American Railroads, * * *, with such revisions as may have been adopted prior to the enactment of such Act, for the installation, inspection, maintenance, and repair of all power or train brakes for common carriers engaged in interstate commerce by railroad. Such rules, standards, and instructions shall thereafter remain the rules, standards and instructions for the installation, inspection, maintenance, and repair of all power or train brakes unless changed, after hearing, by order of thet Interstate Commerce Commission: *Provided, however,* That such rules or standards or instructions or changes therein shall be promulgated solely for the purpose of achieving safety. * *."

■ The word "interchange" as defined by the Interstate Commerce Commission and as attempted to be enforced here does not coincide with the definition of interchange as that term is used in the rules of the Association of American Railroads. To the contrary, the definition given the term "interchange" by the Interstate Commerce Commission is far more restrictive than that given under the rules. The government seeks to enforce the definition of interchange as handed down in a declaratory order entered by the Commission. The facts upon which this declaratory order was entered do not appear. If the definition as rendered by the Interstate Commerce Commission is based upon the definition of interchange as that term is used in the rules of the Association of American Railroads, then the definition is clearly correct. If, however, there are insufficient facts to establish an interchange as that term is used in the Association of American Railroad rules, then the court cannot say that the definition is valid. That the Interstate Commerce Commission has the power to change the rules cannot be questioned; however, it does not have the power to alter or change rules by interpretation or otherwise, except it first complies with the requirements set forth by Congress. One of the requirements is that the rules, standards, instructions, or changes shall be promulgated solely for the purpose of achieving safety. Without more being shown, it is inconceivable in what manner it is safe for a crew of the New York Central Railroad to replace a crew of the New York Central Railroad and in what manner it would be unsafe for a crew of the New York Central Railroad to be replaced by a crew of the TRRA. If, in fact, upon hearing, it can be established that safety is involved, then the Interstate Commerce Commission under the provisions of the statute has authority to change or alter the rules. It does not otherwise have that power. Here, there has been no hearing, nor has there been a showing that safety is the moving factor.

It is interesting to note that the government states that an interchange did not occur between the TRRA and the Missouri Pacific line, although the Missouri Pacific train crew was replaced by the TRRA crew at the Missouri Pacific Dupo yard and moved over Missouri Pacific rails to the TRRA rails and thence to St. Louis.

The government's charge that an interchange occurred by virtue of a crew change being made at a boundary line between two carriers is not necessarily borne out by the facts, since there is

some question as to whether there is a boundary between New York Central and TRRA. This boundary, if it exists, is more fictitious than real, as was pointed out by the Interstate Commerce Commission in prior rulings.

In 113 I.C.C. 681, at pages 685, 686, the following appears:

"Before proceeding further it is desirable to state briefly the nature, status, and function of the Association. It is a corporation, the stock of which is owned in equal proportions by 15 of the principal east-side and west-side lines serving the St. Louis-East St. Louis district. The east-side lines hold a majority of the shares. The Association's rails cross the river and it has terminal facilities, including depots and team tracks, in both St. Louis and East St. Louis, where it receives and delivers freight. It holds itself out to perform service for all carriers. Though it is a common carrier, it may not legally operate in all respects as a railroad transportation company, having been perpetually enjoined several years ago from operating otherwise than as a terminal and interchange facility for railroads. * * *. The contract between the carriers, by which they may, under the court's decree, continue the Association and the operation of its facilities, contemplates that all carriers shall have equitable treatment in the matter of service, rights, accommodations, benefits, burdens, expenses, charges, etc. Though they do not ordinarily exercise them, the proprietary companies have trackage rights over the Association's line between St. Louis and East St. Louis. Under this contract the properties of the Association represent, in legal and practical effect, the extension of the east-side lines into St. Louis and of the west-side lines into East St. Louis."

The Interstate Commerce Commission also referred to TRRA lines as mere extensions of east-west trackage in Manufacturers Ry. Co. v. Ahnapee & W. Ry. Co., 172 I.C.C. 554, at 563-4:

"The proprietary lines of the Terminal have contractual trackage rights to operate their trains over the bridges and tracks owned, leased, or controlled by the Terminal, although none of them exercises such rights for freight service, except the Wabash, * * *. The east-side lines take the position that because of these rights the Terminal is an extension of their rails, and that to grant the relief sought would short haul their lines within the meaning of section 15(4). They rely upon C., R. I. & P. Ry. Co. v. B. & O. R. R. Co., 113 I.C.C. 681, in which we said that under the trackage contract the properties of the Association (Terminal) represent in legal and practical effect the extension of the east-side lines into St. Louis and of the west-side lines into East St. Louis. * * *."

The mythology of boundary lines, as concerns the TRRA and the road lines, is also considered in Laclede Steel v. Louisville & N. R. Co., 222 I.C.C. 321 at 325, where it is stated:

" * * *, on traffic of the character here considered, whether originating at the freight station of the Louisville & Nashville in St. Louis, on the rails of the Terminal in St. Louis, or at complainant's plant at Madison, which is moved thence by the Terminal to the Louisville & Nashville interchange point in East St. Louis, the Terminal did not and could not operate as a 'transportation company' for itself. but instead, acted and will continue to act as the *bona fide* agent and servant' of the Louisville & Nashville. That this is true in actual practice is shown by the testimony of the witness for the Terminal to the effect that whether a shipment originates in St. Louis or at complainant's plant at Madison his company would sign the bill of lading as the agent of the Louisville & Nashville, and that the Terminal would act as the impartial agent of the road-haul carrier and not as an independent railroad. * * * Under such circumstances the conclusion is inescapable that Madison, the intermediate point,

is situated *between two points on the same railroad* \* \* \* from which the line-haul rates sought were provided in the applicable tariff. \* \* \*."

■ The court finds that an interchange did not occur between the New York Central lines and the TRRA lines when a crew change was effected upon the trains reaching the TRRA facilities, as that term is used in 49 CFR 132.12, and, therefore, Terminal Railroad Association is not guilty of violating the provisions of 49 CFR 132.12 with regard to the New York Central and TRRA trains.

■ The facts surrounding the Missouri Pacific movement from Dupo, Illinois, by the TRRA are as follows: The Missouri Pacific train was made up in Little Rock, Arkansas, and was destined for the Pennsylvania and B. & O. Railroads. At Little Rock the train was given an initial terminal brake test. When the train reached the Missouri Pacific yard at Dupo, the locomotive and caboose were removed and a TRRA locomotive and caboose coupled on. No other change was made in the consist. The train was then moved onto TRRA tracks and delivered to the Pennsylvania and B. & O. Railroads. The brake test required by 49 CFR 132.13(e) (1) was not made. It is conceded that no interchange occurred between Missouri Pacific and TRRA; rather, the interchange was made directly between Missouri Pacific and the receiving carriers, namely, Pennsylvania or B. & O. The sole question to consider with regard to this movement is whether TRRA complied with the power brake rules when it made the air brake test prescribed by 49 CFR 132.13 (c) (1) or whether it was required to make the test prescribed by 49 CFR 132.13(e) (1). It was conceded that the (c) (1) test was made (commonly referred to as the "rear end test"), but that the (e) (1) test (commonly referred to as "walking the train") was not made.

The government argues that the Commission's rules contemplate that every train will receive a brake test when initially assembled and additional tests under certain conditions while the train is still on the line of the railroad making the initial terminal test; that such a condition is described in 132.13(c) (1); that when the initial terminal test has been made, section 132.13(c) (1) provides for a lesser test; but that this section does not apply to TRRA on the Missouri Pacific trains, since these trains had not received the initial test on the line of TRRA, and although the Missouri Pacific may have given the trains a proper initial terminal test, defendant TRRA had no knowledge of the condition of the air brakes of these cars.

The government's position is apparently premised on the fact that the TRRA, being a separate entity from the Missouri Pacific, had the absolute duty to make a full complete safety check, notwithstanding the initial terminal test had been made by the Missouri Pacific and notwithstanding the train was received by the TRRA on the Missouri Pacific tracks. The government apparently bases its entire case on the charge that when the locomotive and caboose and crew were changed somehow the complexion of the train changed and this became the initial terminal. It is not contended that this was the initial assembly point, nor could it successfully be so contended, since the consist remained unchanged except for the locomotive and caboose. The defendant argues that the train involved was not a transfer train or a yard train but rather was a Missouri Pacific through freight train and not a transfer train or yard movement as charged by the government.

The facts are sufficient to establish that Missouri Pacific's Dupo yard is not an initial terminal of TRRA. TRRA does not own any property at Dupo and could not assemble a train there, nor is it charged that the train was assembled by TRRA. The facts firmly establish that the train movement involved was simply a continuation of a Missouri Pacific through train which originated in Little Rock, Arkansas, and was destined for the Pennsylvania and B. & O. Railroads. Nowhere has it been shown

that the power brake rules make ownership of the track or the ownership of the locomotive and caboose or the employment of the crew a factor in determining what kind of a test should be made. The government does not contend that an interchange occurred in the Missouri Pacific movement. It specifically states that 132.12 does not apply, even though the train is moved from Missouri Pacific rails onto and across TRRA rails, although it does charge that an interchange occurred when similar conditions were present in the New York Central movements.

The court finds that the test performed by TRRA upon the Missouri Pacific movement, namely, that required by the provisions of 132.13(c) (1), was adequate and that under the facts as here presented it was not necessary that the TRRA perform the rest required by 132.-13(e) (1).

The court finds that defendant TRRA was not guilty of violating the provisions of the Safety Appliance Act with regard to the Missouri Pacific movements.

Parties to settle the order.