# LOUISVILLE & NASHVILLE RAILROAD COMPANY ET AL. *v.* UNITED STATES ET AL.

No. 333.   Argued January 15, 16, 1931.—Decided February 25, 1931.

*Mr. Alfred P. Thom,* with whom *Messrs. Edward S. Jouett, R. V. Fletcher, John J. Cornwell, Robert B. Tunstall, H. N. Quigley,* and *Alfred P. Thom, Jr.,* were on the brief, for appellants.

*Mr. Daniel W. Knowlton,* Chief Counsel, Interstate Commerce Commission, with whom *Solicitor General Thacher* and *Mr. Elmer B. Collins,* Special Assistant to the Attorney General, were on the brief, for the United States et al.

Mr. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

This is an appeal from a decree of the District Court, constituted as required by statute, dismissing the petition of the appellants to set aside, in part, two orders of the Interstate Commerce Commission, which were made on November 4, 1929, and July 30, 1929, respectively.

The first mentioned order was made in a proceeding instituted by the Commission in December, 1925, on its own motion, for an investigation concerning the use of private passenger-train cars, including so-called office cars. A questionnaire was sent to all Class I and Class II carriers, and to switching and terminal carriers, calling for information " as to private passenger-train cars owned, leased or operated, the movement or use of such cars as were transported free or at less than tariff rates on home and foreign lines, and the occupants of such cars on respective trips." Returns were made by 387 carriers covering the calendar years 1923, 1924 and 1925. In July, 1928, a proposed report was served upon appellants and

all other carriers. Exceptions were filed by the Association of Railway Executives on behalf of its members, including the appellants; argument was heard and the matter submitted to the Commission. Its report was issued on June 21, 1929, setting forth the Commission's findings and conclusions. 155 I. C. C. 775. After waiver by the carriers of further hearing before the Commission, the order in question was entered requiring the carriers named, including these appellants, " to cease and desist, on or before January 15, 1930, and thereafter to abstain, from the transportation or movement of private passenger train cars, including so-called office cars, of another carrier free or at other than published tariff rates."

The other order of the Commission under attack, that is, the order of July 30, 1929, amended the Commission's regulations, governing the form and recording of passes, by the insertion of the following: "A car pass may be issued only for cars owned by the issuing carrier or held by it under lease for use in its business as a common carrier. It may not be issued for other cars. This provision is not to be construed as prohibiting the issuance of passes for cars of lines operated as a part of the same system. See In the Matter of Private Passenger Train Cars, 155 I. C. C. 775."

The case was tried in the District Court on the facts detailed in the report of the Commission as to the practices of the carriers, and as to these facts there was no dispute. The court concluded that the practice condemned by the Commission was a matter within its jurisdiction, and that, the order being supported by substantial evidence, the court was without power to interfere.

The evidence before the Commission consisted of the returns of the carriers to its questionnaire. These returns contained a vast amount of statistical data, differing in details but practically the same in substance, which were reviewed and tabulated in the Commission's report. The Commission found, in substance, that carriers transported

free of charge the private, or office, cars [1] of other carriers when occupied by persons for whose transportation it was lawful to issue a pass; that carriers also provided accessorial transportation of such cars free of charge when they were moved " deadhead " to stations where they were to be occupied, or to their home stations after occupancy, and also in switching and storing the cars. The wide extent of the practice and the abuses attending it were shown.[2] The Commission referred to the proposal of the

---

[1] The Commission's report and order described the cars in question as private passenger-train cars, or private passenger cars, including so-called office cars. The reference is to the private, or office, cars of carriers as ,distinguished from cars privately owned by persons and corporations other than railroad companies.

[2] The Commission's report states (in part): " The returns show that a substantial portion of the total mileage of private passenger-train cars, including so-called office cars, herein referred to collectively as private cars, was on the lines of carriers other than those owning the cars. The private cars thus moved over foreign lines were transported without charge. In other words, a pass was issued covering transportation of the private cars similar to that issued for the transportation of certain classes of persons as provided for in sections 1 and 22 of the act. . . .

" It will be understood that a private car includes a kitchen, dining room, staterooms, and observation or sitting room, together with storage space and sleeping quarters for the cook and attendants. The facilities thus provided for those traveling in private cars excel the facilities of the ordinary coach or Pullman car.

" The returns . . . show that the occupants of private cars are not restricted to officials and employees of the carriers but include in a large number of cases the families, relatives, and friends of railway officials traveling on passes or on tickets that would in most cases entitle them only to transportation in the ordinary coach." (The report cites many instances of the movement of such cars when in charge of the wives of officials and the widows of deceased officials.) . . .

" There is also a substantial use of private cars, both on home and foreign lines, by directors of carriers. . . .

" The movement of private cars to resorts commonly patronized by those seeking recreation or amusement, and located on foreign

carriers to undertake the correction of such abuses, and stated that the Commission was concerned primarily with the legality of the free transportation of the private cars of other carriers.

With respect to the transportation of privately owned cars, that is, of cars owned by others than carriers, or of cars chartered for the exclusive use of special parties, the Commission found that such cars were transported in pas-

lines, is very noticeable. . . . There is also an extensive use of private cars by short lines, industrial roads, and lines owned, controlled, or used in the interest of some particular business. The mileage of private cars used by the latter lines is largely on foreign lines, and in numerous instances the home stations of the cars and the movements thereof are so far removed from the vicinity of the owning road that it is difficult to conceive the circumstances under which such movements could have been in the interest of or connected with the operation of the road owning the car. . . .

" The returns show that a substantial portion of the total mileage of private cars, especially on foreign lines, was what is commonly referred to as ' deadhead ' mileage, that is, the cars were not occupied, except in some instances by an attendant. The purpose of such movements is to return the cars to their home stations or to move them to stations where they are to be occupied. . . . The returns show numerous instances where private cars were deadheaded to and from off-line shops without charge. Also worthy of consideration is the matter of free switching service and free storage for private cars. A large number of the private cars covered by the returns are held at off-line stations when not in use. Many are so held at New York and the returns indicate that the matter of storage and switching of these cars is of considerable importance from the standpoint of operating expenditures. In numerous cases cars were rented from the Pullman Company by officers of carriers, and such cars were moved without charge by the carriers. . . .

" The private cars of railroad officials are intended to be offices on wheels for those whose duties require considerable travel over the line and when used for that purpose are an important facility for carrying on the business of the road. It is seldom, however, that these duties necessitate a movement of the car over other lines. In some cases such a movement may be justified for business reasons; for example, where it avoids a very circuitous haul over the

senger trains under tariffs which provided for certain minimum revenues,[3] and that these charges were intended to cover the service of transporting the cars, that is, "to

home line. But the returns to our questionnaire indicate that private cars are often used for other than business purposes by railroad officers, their relatives, and friends. Moreover, they appear to be used in some instances for the benefit of an industry which controls the railroad. In other instances, their use in entertaining shippers may be for the purpose of obtaining business for the railroad. These and other abuses are apparent from the returns, but we are here concerned primarily with the legality of the free transportation of the private cars of other carriers." 155 I. C. C., pp. 776, 778, 779, 781, 782, 783.

[3] The Commission stated: "Special, privately owned, or chartered cars for the exclusive use of special parties are transported in passenger trains under tariffs which provide for certain minimum revenues. In the case of sleeping and parlor cars, charges for a one-way movement are based on the authorized fare for each passenger, with a minimum of 25 adult fares, but not less than $42 for the car and party. The charges for a round-trip movement are similar, except the 25 fares are doubled or must be for the round trip, and the minimum revenue is $84. In either case, the surcharge must be paid for each passenger, with a minimum of 25 surcharges, but this is not used in computing the minimum revenue per car. When a car is moved empty or in charge of porter or other attendants, charges are assessed on the basis of 10 regular adult one-way fares, plus the authorized fare for each porter or attendant, except not more than three employees of common carriers may be carried free. In this case also the minimum revenue is $42, including fares of attendants, but the surcharge is not collected. In some of the tariffs the charges for empty movements apply to carrier-owned as well as privately owned equipment. The tariffs also provide for application of the minimum fares and revenue on carrier-owned cars equipped for certain special purposes, such as advertising, exhibition, instruction, and the like. These are the provisions generally in effect, although there may be variations on individual lines. The term privately owned cars is not defined in the tariffs, but its obvious meaning is cars owned by others than the carriers. Apparently a private car owned by an individual even though a railroad official would be subject to the tariff charges on privately owned cars. . . ." 155 I. C. C., pp. 787, 788.

compensate for the movement of the car rather than its contents."[4] The Commission concluded that the transportation of the private cars of other carriers free, or at less than published rates, while making charges for the movement of privately owned or chartered cars, was unjustly discriminatory.

Treating the private, or office, cars of other carriers as property, to which the provisions of the Interstate Commerce Act applied, and considering that the free transportation of property was lawful only in the exceptions provided in section 22 of the Interstate Commerce Act, the Commission concluded that the transportation of such cars free, or at other than published tariff rates, was a violation of the Act. The Commission pointed out that its finding "does not extend to the point of saying that it is unlawful for private cars of one carrier to be transported over the lines of other carriers, but is confined to the assertion that under existing law the transportation of private cars on foreign lines should be paid for through the assessment of a just and reasonable charge." 155 I. C. C. p. 793.

The conclusions of the Commission were thus summarized in its order of November 4, 1929:

" 1. That the transportation or movement of private passenger cars, including so-called office cars, of one car-

---

[4] The Commission said on this point: "As heretofore pointed out, the tariffs provide certain minimum fares and revenues for the movement of special, privately owned, or chartered cars, which are evidently intended to cover the service of transporting the car. This is apparent from the fact that the charges are the same whether the car is occupied by 1 passenger or 25. Especially in the case of cars moving empty or in charge of porter, it is manifest that the minimum fares and revenue are intended to compensate for the movement of the car rather than its contents. Apparently the only material difference between the cars on which these minimum charges apply and the private cars of other carriers is the matter of who owns or is using them." 155 I. C. C., p. 792.

rier subject to the Interstate Commerce Act by another such carrier free or at other than published tariff rates is contrary to the provisions of the Interstate Commerce Act;

" 2. That it is unjustly discriminatory and unduly preferential and prejudicial to haul such private cars of other carriers free, or at less than published tariff rates, while charging certain minimum fares and revenues for the movement of privately owned or chartered cars; and

" 3. That the transportation of persons in such private passenger cars, including berth and other accommodations, at the rate charged passengers provided only with ordinary coach accommodations is unjustly discriminatory and unduly preferential and prejudicial."

Appellants state that they are not attacking the third of these propositions; that is, there is no effort in this suit to set aside that part of the Commission's order which relates to the transporting of revenue passengers in business cars at the rate charged passengers holding tickets which are good only in the coach. The appellants say that it is the purpose of the carriers to remove this discrimination in some satisfactory way.

The first two propositions are those in controversy. The appellants confine their complaint in this Court to the aspect of the Commission's order which holds unlawful the movement by a carrier subject to the Act " of the private or business car of another such carrier when such car is occupied by a person using, and lawfully entitled to use, free transportation." A similar position is taken with respect to the other order of the Commission (of July 30, 1929), amending the Commission's regulations as to passes.

With the premise that the Commission has no authority except that delegated to it by the Congress, the appellants contend (1) that the movement under consideration " is not a shipment of property subject to section 6 of the

Interstate Commerce Act, which relates to property shipments"; and (2) that "the transaction here involved does not violate the discrimination provisions" of the Act.

We may first consider the question of unjust discrimination. It is not open to dispute that there is discrimination in fact. The findings of the Commission are decisive upon that point. The tariffs of the carriers provide for certain minimum fares and revenues for the movement of the private cars of individuals and of corporations other than those of other carriers. These charges, as the Commission found, cover the service of transporting the car and not simply the passengers. "Apparently," said the Commission, "the only material difference between the cars on which these minimum charges apply and the private cars of other carriers is the matter of who owns or is using them." The Commission found that this discrimination is unjust and, so far as this is a question of fact, it does not appear that the finding lacks adequate support. The appellants emphasize the convenience to railroad officials of the existing practice. It is said that much of a railroad officer's time is spent in traveling, not only over his own lines, but to points on the lines of other railroads, in connection with questions of management and operation, as well as of financial and other executive policies of importance to all the railroads; that he must attend meetings and conferences, and hearings before Commissions; that during such journeys, which frequently cover long periods, he is handling mail and business documents, and is giving attention to the conduct of his railroad work; and that he must take with him voluminous papers, and office assistants. It is also pointed out that inspection of the properties of other carriers is necessary to good management and has high educational value. But, if it be assumed that the existing practice is a convenience to railroad officials, still it does not appear that the convenience is essentially one peculiar to

their case. The finding of the Commission is that, while the use of private cars of railroad officials as " offices on wheels for those whose duties require considerable travel over the line," is an important facility for carrying on the business of the road, " it is seldom, however, that these duties necessitate a movement of the car over other lines." And it is a matter of common knowledge that there are large enterprises, other than railroads, extending throughout the country, or large portions of it, and requiring executive supervision; that there are numerous meetings and conferences, held in different parts of the country, of national organizations representing undertakings which are nation-wide in scope; and that those charged with administrative responsibilities in important activities must give appropriate attention to them while on their travels in the discharge of their duties or in the promotion of the interests confided to their care. Discrimination by a carrier with respect to the movement of private cars over its line, in favor of the officials of other railroad companies, and against all others who may desire the transportation of such private cars for their convenience, would require evidence to justify it (unless it can be deemed to lie outside the purview of the statute) and that evidence is lacking. We perceive no ground for disturbing the finding of the Commission as to unjust discrimination, unless it can be said as matter of law that there was none; that is, that the difference in treatment was one which was sanctioned by the Interstate Commerce Act. It is the contention of the appellants that the practice has this sanction.

The legislative history of the Interstate Commerce Act shows clearly that the evil of discrimination was the principal thing aimed at. Senate Report No. 46, 49th Cong., 1st sess., p. 215. See *Kansas City Southern Ry. Co.* v. *Albers Commission Co.*, 223 U. S. 573, 597. This Court has said that the language of the Act " is certainly sweeping enough

to embrace all the discriminations of the sort described which it was within the power of Congress to condemn." [5] *The Shreveport Case*, 234 U. S. 342, 356. Section 3 provides that " it shall be unlawful for any common carrier . . . to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever." The prohibition, of course, does not reach the exceptional cases for which provision is made by sections 1 and 22 of the Act with respect to passes.[6] These provisions relate to the transportation,

---

[5] " Sec. 2. If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property or the transmission of intelligence, subject to the provisions of this chapter, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation or transmission of a like kind of traffic or message under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful ". U. S. C., Tit. 49, § 2.

" Sec. 3 (1). It shall be unlawful for any common carrier subject to the provisions of this chapter to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever." U. S. C., Tit. 49, § 3.

[6] " Sec. 1. . . . (7) No common carrier subject to the provisions of this chapter, shall, directly or indirectly, issue or give any interstate free ticket, free pass, or free transportation for passengers, except to its employees and their families, its officers, agents, surgeons, physicians, and attorneys at law; to ministers of religion, traveling secretaries of railroad Young Men's Christian Associations, inmates of hospitals and charitable and eleemosynary institutions, and per-

free or at reduced rates, of the persons and property there described.  Neither section provides for the free transportation of private cars.  If discrimination, which would

sons exclusively engaged in charitable and eleemosynary work; to indigent, destitute and homeless persons, and to such persons when transported by charitable societies or hospitals, and the necessary agents employed in such transportation; to inmates of the National Homes or State Homes for Disabled Volunteer Soldiers, and of Soldiers' and Sailors' Homes, including those about to enter and those returning home after discharge; to necessary caretakers of live stock, poultry, milk, and fruit; to employees on sleeping cars, express cars, and to linemen of telegraph and telephone companies; to Railway Mail Service employees, post-office inspectors, customs inspectors, and immigration inspectors; to newsboys on trains, baggage agents, witnesses attending any legal investigation in which the common carrier is interested, persons injured in wrecks and physicians and nurses attending such persons: *Provided,* That this provision shall not be construed to prohibit the interchange of passes for the officers, agents, and employees of common carriers, and their families; nor to prohibit any common carrier from carrying passengers free with the object of providing relief in cases of general epidemic, pestilence, or other calamitous visitation: *And provided further,* That this provision shall not be construed to prohibit the privilege of passes or franks, or the exchange thereof with each other, for the officers, agents, employees, and their families of such telegraph, telephone, and cable lines, and the officers, agents, employees, and their families of other common carriers subject to the provisions of this chapter: *Provided further,* That the term ' employees ' as used in this paragraph shall include furloughed, pensioned, and superannuated employees, persons who have become disabled or infirm in the service of any such common carrier, and the remains of a person killed in the employment of a carrier and ex-employees traveling for the purpose of entering the service of any such common carrier; and the term ' families ' as used in this paragraph shall include the families of those persons named in this proviso, also the families of persons killed, and the widows during widowhood and minor children during minority of persons who died, while in the service of any such common carrier. . . ." U. S. C., Tit., 49, § 1 (7).

" Sec. 22. (1) Nothing in this chapter shall prevent the carriage, storage, or handling of property free or at reduced rates for the

otherwise be unjust and condemned by the Act, can be deemed to be saved by the exceptions stated, it must be either because the transportation of a private car is to be regarded as incidental to the free transportation of a passenger who may hold a pass, or because the transportation of a private car occupied by a passenger with a pass is not a service rendered under circumstances and conditions substantially similar to those of the transportation of a private car with passengers paying fares.

Neither of these propositions is tenable. The pass which the statute allows is in lieu of the passenger's fare and is for the transportation of the passenger. The terms of the statutory permission go no further. Passes may be given under the statute to a variety of persons, including not only the principal officers of railroad companies but the agents and employees of common carriers, and their families, including among others, for example, furloughed and superannuated employees, and those who have become disabled or infirm in the service of a carrier, and also " the families of persons killed, and the widows during

---

United States, State, or municipal governments, or for charitable purposes, or to or from fairs and expositions for exhibition thereat, or the free carriage of destitute and homeless persons transported by charitable societies, and the necessary agents employed in such transportation, or the issuance of mileage, excursion, or commutation passenger tickets; nothing in this chapter shall be construed to prohibit any common carrier from giving reduced rates to ministers of religion, or to municipal governments for the transportation of indigent persons, or to inmates of the National Homes or State Homes for Disabled Volunteer Soldiers, and of Soldiers' and Sailors' Orphan Homes, including those about to enter and those returning home after discharge, under arrangements with the boards of managers of said homes. Nothing in this chapter shall be construed to prevent railroads from giving free carriage to their own officers and employees, or to prevent the principal officers of any railroad company or companies from exchanging passes or tickets with other railroad companies for their officers and employees; . . ." U. S. C., Tit. 49, § 22 '(1).

widowhood and minor children during minority of persons who died, while in the service of any such common carrier." It would hardly be thought a reasonable contention that the transportation of a private car should be deemed incidental to the free transportation of all the persons in the categories mentioned. But so far as the pass *per se* is concerned, the hauling of a private car occupied by such a person is as much, and as little, incidental to the pass in one case as in any other. Even in the case of a railroad official, it appears that if he owns the private car, its transportation would be subject to the tariff charges on privately owned cars, (155 I. C. C. p. 788). The distinction, then, must be found, not in the fact that a pass may be issued for the transportation of the passenger, or that the passenger is a railroad official, but in the fact that the private car in which the holder of the pass is traveling belongs to another carrier. We find nothing in the terms of the statute recognizing such a differentiation. See *New York, N. H. & H. R. Co.* v. *Interstate Commerce Comm.*, 200 U. S. 361; *Interstate Commerce Comm.* v. *Baltimore & Ohio R. Co.*, 225 U. S. 326, 341, 342.

Nor can it be said that so far as the transportation of the private car itself is concerned, the service is not rendered under substantially similar circumstances and conditions whether the occupants have passes or pay for their transportation as passengers. The circumstances and conditions relating to the transportation of the cars, *as such*, are alike. The cars are hauled between the same points, on the same line, in the same or like passenger trains, and in the same manner.

The appellants' contention rests largely upon the long continuance of the practice of the carriers to transport the private, or office, cars of other carriers free of charge, and upon the fact that the Interstate Commerce Commission has not only not interfered with the practice here-

tofore, but has apparently sanctioned it by its regulations in recognizing passes for such cars. The argument based on this asserted sanction is addressed both to the conclusion of the Commission that the movement of such cars free, or at other than published tariff rates, is contrary to the provisions of the Interstate Commerce Act, and to the conclusion of the Commission as to unjust discrimination. It is said that in view of the nature of the subject of the transportation, and especially in the light of past administrative construction, the Act should be construed as not forbidding the free transportation of the cars in question, and that, if it is lawful to move the carrier-owned car free, no unlawful discriminatory conditions arise from the difference of treatment of privately owned cars. In this view, the right of free transportation of the cars in question is made the fundamental consideration and we pass to the examination of that question.

Supporting their contention in this respect, the appellants argue that the movement of the private, or office, car of another carrier is not a shipment of property; that such a car in the movement under consideration is to be regarded as a facility of the carrying line, ranking as its own for the purposes of the service. The Commission dealt with the question when railway equipment generally may be transported without charge. The Commission said that, of course, a carrier may transport its own property without the payment of tariff charges; that, likewise, property which is hired or rented for the performance of its common-carrier duties may be transported in the same way as property which it owns. The Commission reviewed the terms on which freight cars and passenger cars move over foreign lines. It found that " so long as a car is being handled for revenue purposes, it is in service and not subject to charges; but when it is transported

solely for the benefit of the owning line, the latter must pay for such transportation on another line." The Commission further found that " the criterion for determining when a passenger car is in service would seem to be the same as in the case of a freight car; that is, whether the car is being handled for revenue purposes in the interest of all the carriers in the through route or solely for the benefit of the owning line." 155 I. C. C., pp. 786, 787. After referring to the tariff charges for the movement of " special, privately owned, or chartered cars for the exclusive use of special parties " when transported in passenger trains,[7] the Commission reached the following conclusion: " It will be seen from the foregoing that tariff charges are provided for the transportation in freight trains of both carrier and privately owned cars of all kinds, when they are handled solely for the benefit of the owner and not for revenue purposes. It would not be seriously urged that such transportation could be rendered free if an attendant or other person having a pass should ride in the car. The tariffs also provide minimum charges for the transportation in passenger trains of special, privately owned, or chartered cars for the exclusive use of special parties. Apparently these minimum charges would not be lessened or affected in any way if a person or persons having passes should ride in the car. All of these charges show that there is nothing in the nature of railway equipment which justifies its transportation without charge, except when it is being handled for revenue purposes in the interest of the carrier performing the service. Even, then the revenue from a passenger car used exclusively by a special party must be sufficient to warrant its transportation. . . . The transportation of a private car of another carrier is ordinarily for the benefit of the owning line or its officials and not for revenue purposes. While

---

[7] See Note 3.

ticket passengers may sometimes occupy such a car, they do so by invitation, and the carrier performing the transportation is not at liberty to make use of the car by putting other passengers in it. The returns to our questionnaire indicate that it is seldom, if ever, that the number of ticket passengers is sufficient to make the hauling of the private car of another carrier profitable to the carrier performing the service. This is further indicated by the additional fact that such passengers apparently do not pay the surcharge, which is assessed on persons riding in Pullman and privately owned or chartered cars. Indeed, the few ticket passengers sometimes riding in the private car of another carrier could probably be accommodated in other equipment that must be hauled anyhow, and the transporting carrier would receive more revenue if they rode in an ordinary Pullman car. Under these circumstances a carrier hauling the private car of another line can not be said to have hired its use, as it would have no interest in doing so and pays no rental therefor. Even if car hire should be provided on private cars, it would obviously be a mere subterfuge which could not change the legality of the practice. Our conclusion is that the transportation of the private car of another carrier is not of such advantage to the carrier performing the service as to warrant its peformance without charge, on the same principle as the free handling of revenue-producing equipment." *Id.*, pp. 788, 789. On the findings of the Commission, we perceive no ground for the conclusion that the cars in question are to be treated merely as a facility of the carrying line and not as property transported.

The Commission referred to the argument that the carriers had always hauled the private cars of other lines without charge, and that this practice had been well known to the Commission and had been expressly approved by it. Endeavoring to meet the contention that the Commission in its conference rulings and pass regula-

tions of 1917 had prescribed a form of pass for railway officials and employees, which included the word " car," and which, as the carriers asserted, applied to foreign-line cars, the Commission said that the form of pass should be given a construction in harmony with the law and that the Commission " never intended to approve the practice of issuing passes for the private cars of other lines." There is, however, no question as to the long-continued practice of transporting the private cars of other lines without charge, and it would seem that the form of pass prescribed by the Commission was available and was used in this practice. The Commission stated that this was the first time that the lawfulness of the practice of issuing passes for foreign-line private cars had been brought in issue before it, but the Commission recognized that the practice prevailed at the time of the passage of the Act to Regulate Commerce and had been continued. It appears that prior to this proceeding, the Commission had not attempted to disturb it.

The Act has been repeatedly amended, and has been reënacted, without any change directed to the correction of this practice. It is strongly urged that in the light of these circumstances the administrative construction should be determinative. The principle is a familiar one that in the interpretation of a doubtful or ambiguous statute the long continued and uniform practice of the authorities charged with its administration is entitled to great weight and will not be disturbed except for cogent reasons. *Logan* v. *Davis,* 233 U. S. 613, 627; *Kern River Co.* v. *United States,* 257 U. S. 147, 154; *Swendig* v. *Washington Water Power Co.,* 265 U. S. 322, 331; *United States* v. *Minnesota,* 270 U. S. 181, 205; *Wisconsin* v. *Illinois,* 278 U. S. 367, 413. But that principle does not go far enough to control the decision here. There is no ambiguity in the requirement of section 6 (1) of the Act that its provisions as to published tariffs " shall apply to all traffic, transpor-

tation, and facilities defined in this Act." Whether the private, or office, cars of other carriers are to be deemed property transported, or a facility of the carrying line, depends upon the circumstances of the carriage as matters of fact, and when the facts have been resolved by the Commission upon evidence, there is no escape from the application of the broad provision of the statute. Similarly, there is no ambiguity, so far as the terms of the provision of section 3 (1) are concerned, in its prohibition of discriminations, when it has been found as a fact that these cars are transported for the benefit of the owning line and do not belong in the category of the facilities of the carrying line, and that transporting them free of charge constitutes an unjust discrimination, as compared with the tariff charges for the transportation of privately owned cars. Nor are the provisions of sections 1 (7) and 22 (1) to be deemed ambiguous by reason of the omission of private, or office, cars owned by carriers from the specification of persons or property that may be carried free. The omission simply takes the cars out of the provisions of the sections. Whatever doubt or uncertainty attached to the application of the provision of the Act to the transactions under review lay in the appreciation of the facts, and appropriate action thereon, and not in the interpretation of the terms of the law after the facts have been ascertained. Thus, in *American Express Co.* v. *United States,* 212 U. S. 522, it was argued by the appellants that the custom of express companies to issue such passes as were there in question was one of long standing and presumably known to Congress; that there was no record of any protest against it to or by the Interstate Commerce Commission, or to Congress, nor any suggestion in any speech or report that it was supposed to be detrimental to the public interest, or that it was intended to be prohibited; that there was no direct or express pro-

hibition in the statute, but, on the contrary, the Interstate Commerce Act recognized and always had recognized that the granting of similar privileges to the officers and employees of railroad companies was consistent with sound public policy. (p. 523.) And this Court stated in its opinion that the facts were not seriously in dispute, and showed that it had been the custom of express companies for many years to issue franks such as were embraced in the proceeding. (p. 529.) But this Court held that, in view of the all-embracing prohibition of the Act, it could not be doubted that the transportation of property, such as was shown in that case, upon franks issued by the express companies, was within the terms of the Act. If the practice could be deemed to be lawful, the Court said that the right must be founded upon some exception incorporated in the statute. The Court found no such exception and gave effect to the Act according to its terms.

Long continued practice and the approval of administrative authorities may be persuasive in the interpretation of doubtful provisions of a statute, but cannot alter provisions that are clear and explicit when related to the facts disclosed. A failure to enforce the law does not change it. The good faith of the carriers in the transactions of the past may be unquestioned, but that does not justify the continuance of the practice.

We are of the opinion that the order of the Commission of November 4, 1929, was within its authority. For similar reasons, we conclude that the Commission had power to revise its regulation as to passes in the manner provided by the order of July 30, 1929.

*Decree affirmed.*

Mr. Justice McReynolds and Mr. Justice Sutherland are of opinion that the decree of the court below should be reversed.