The CINCINNATI, NEW ORLEANS & TEXAS PACIFIC RAILWAY COMPANY, Plaintiff,

v.

The CHESAPEAKE AND OHIO RAILWAY COMPANY, Defendant.

The CINCINNATI, NEW ORLEANS & TEXAS PACIFIC RAILWAY COMPANY, Plaintiff,

v.

The BALTIMORE AND OHIO RAILROAD COMPANY, Defendant.

The CINCINNATI, NEW ORLEANS & TEXAS PACIFIC RAILWAY COMPANY, Plaintiff,

v.

PENN CENTRAL TRANSPORTATION COMPANY, Defendant.

Civ. A. Nos. 137–69–A to 139–69–A.

United States District Court,
E. D. Virginia,
Alexandria Division.

May 12, 1970.

Boothe, Dudley, Koontz, Blankingship & Stump by Fred C. Alexander, Jr., Alexandria, Va., of counsel, for H. Merrill Pasco, Richmond, Va., and Duncan B. Phillips, Washington, D. C., for plaintiff.

Plato Cacheris, Alexandria, Va., of counsel for Steptoe & Johnson, by Laidler B. Mackall, Washington, D. C., for defendants Chesapeake & Ohio Railway and Chesapeake & Ohio Railroad.

Howard W. Smith, Jr., Alexandria, Va., for defendant Penn Central.

## MEMORANDUM OPINION

OREN R. LEWIS, District Judge.

The question here is whether the plaintiff's published tariff or the pre-existing agreement between the involved railroads governs the charge for "no bill" cars at the Cincinnati interchange.

The plaintiff, The Cincinnati, New Orleans & Texas Pacific Railway Company, a subsidiary of the Southern Railway System, operates the interchange facility in Cincinnati, Ohio, at which railroad freight cars of plaintiff's and defendants' lines are interchanged. The defendants are The Chesapeake and Ohio, The Baltimore and Ohio, and Penn Central Transportation railroads. All are members of the Association of American Railroads and the Cincinnati Superintendents Committee, both of which have promulgated and published rules and regulations governing the interchange of railroad cars between connecting carriers.

The pertinent portion of Rule 7 of the Code of Car Service Rules—Freight, of the Car Service and Per Diem Agreement, of the Association of American Railroads, reads as follows:

"(A) Cars shall be considered as having been delivered to a connecting railroad when placed upon the track agreed upon and designated as the interchange track for such deliveries, accompanied or preceded by necessary data for forwarding and to insure delivery, and accepted by the car inspector of the receiving road.

"Notwithstanding the foregoing paragraph, the receiving road shall be responsible for the cars, contents and per diem after receipt of the proper data for forwarding and to insure delivery. This responsibility shall continue as respects cars rejected by the car inspector of the receiving road until such cars have been returned to the delivering road. The effect of this paragraph may be altered by special arrangements made between the roads concerned."

Rule 4 of the Cincinnati Superintendents Agreement reads as follows:

"No charge will be made between railroads in Cincinnati for cars switched to them in error where the error is chargeable to railroad companies."

All of the railroads using the Cincinnati interchange have lived by these rules until November 23, 1968, at which time the plaintiff published a tariff which then went into effect. This tariff reads:

"When cars, empty or loaded, are received by the [plaintiff railroad] from its connections at Cincinnati, Ohio, without billing (See Note), such cars will upon request of the delivering carrier be returned and the [plaintiff carrier] will assess a charge of $20.00 per car for returning the empty or loaded car to the connection of the carrier making the request.

"Note—When instructions are not received within twenty four (24) hours from time of receipt of car from connections, a hold charge of $5.00 per car will be assessed for each twenty four (24) hours or fraction thereof thereafter."

Beginning with November 23, 1968 the plaintiff railroad billed the defendant railroads in accordance with this published tariff. The defendant railroads refused to pay the bill. This suit followed.

Jurisdiction is grounded on 49 U.S.C. § 1, et seq., and 28 U.S.C. § 1337.

The Association of American Railroads, a voluntary association, has been in existence for many years—The Cincinnati Superintendents Committee has been in existence since 1886—Its present articles of association were adopted January 1, 1932.

All of the railroad parties to this suit have fully complied with Rule 7 and Rule 4, supra, in the interchange of cars at Cincinnati until April of 1968. The plaintiff railroad at that time attempted to modify or abolish Rule 4 on the ground that the number of erroneously routed freight cars received then exceeded over three hundred cars per month—To require the plaintiff railroad to hold them awaiting corrected instructions or to return them to delivering lines entailed considerable expense on its part.

The Cincinnati Superintendents Committee, after fully discussing the matter, voted to retain Rule 4 as written—the

plaintiff's superintendent casting the only dissenting vote.

The plaintiff railroad did not then, and had not at the time of the hearing of this suit, resigned or withdrawn from the Cincinnati Superintendents Committee. Instead, it advised the defendant railroads it was going to publish the interchange tariff to cover the cost of handling the so-called "no bill" cars.

Thereafter the plaintiff did file a tariff publication with the Interstate Commerce Commission—The defendant railroads responded by petitioning the Interstate Commerce Commission's Suspension Board to suspend the tariff charge from taking effect. The Suspension Board declined to take such action but stated:

> "This action does not constitute approval of the protested schedules. They may be made subject to investigation through formal complaint filed in accordance with the Commission's Rules of Practice."

This ruling was affirmed by Division 2 of the Commission.

The defendant railroads admit the tariff in question was properly published in accordance with the applicable Interstate Commerce Commission rules but contend that it is not enforcible as to them because it violates the terms and conditions of Rule 7 of the Code of Car Service Rules and Per Diem Agreement of the Association of American Railroads and Rule 4 of the Cincinnati Superintendents Committee.

This Court agrees with that contention.

■■ The plaintiff, relying upon the doctrine of primary jurisdiction, claims such defense must first be made before the Interstate Commerce Commission. The plaintiff misreads the doctrine—The doctrine applies when the reasonableness of the tariff is factually questioned. See Texas & Pacific Railway v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907), and Crain v. Blue Grass Stockyards Co., 399 F.2d 868 (6th Cir. 1968). When the only question presented is one of law it may be decided by the courts without prior referral to the administrative agency. See Great Northern Railway Company v. Merchants Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922). Such is the case here. The defendant railroads do not question the reasonableness of the published tariff. They question only whether it supersedes or invalidates the existing agreements between the parties—namely, Rule 7 and Rule 4, supra.

Next, the plaintiff railroad attempts to bring its published tariff within the mandatory provisions of Section 6 of the Interstate Commerce Act by characterizing the defendant railroads as "shippers," in the case of empty "no bill" cars.

■ The portion of the Interstate Commerce Act (Section 6) requiring the printing and filing of tariffs is designed for and governs relations between common carriers by railroad on the one hand, and the shipping public on the other. See Central & Southern Motor Freight Tariff Association v. United States, 273 F.Supp. 823 (Del.1967). As a general rule, it does not apply to operating matters among railroads, with one exception. That exception arises when a switching carrier performing local, short-haul switching service, performs such service at charges which may be assessed against a shipper or paid by a connecting line-haul carrier. See 49 C.F.R. 1300. Such are not the facts here.

■ This Court finds that the defendant railroads are not shippers in interchanging "no bill" cars, empty or loaded, as that word is used in Section 6 of the Interstate Commerce Act. The plaintiff railroad was not required to publish the tariff in question. See Southern Railway Co. v. Louisville and Nashville Railway Co., 185 F.Supp. 645 (W.D.Ky. 1960). When the Interstate Commerce Commission Suspension Board allowed the plaintiff's published tariff to go into effect, it expressly stated that its action did not constitute approval of the protested schedule. See Arrow Transportation Co. v. Southern Railway Co.,

372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963).

■ A published tariff rate is lawful only when, after a full hearing by the Commission (49 U.S.C. § 1(15)), it has been factually determined to be within the zone of reasonableness. Clearly such was not here done.

■ A published tariff rate is legal when it is properly filed and published with the Interstate Commerce Commission and deals with a matter which may, under the terms of the Act, be the subject of a charge. To fully understand the distinction between "legal" and "lawful," as those words are used by the Commission, see Arizona Grocery Company v. Atchison, Topeka & Santa Fe Railway Co., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932).

The cases cited by the plaintiff railroad in support of its contention that its published tariff has the effect of law and cannot be overridden by a private contract between the parties are inapplicable to the findings here, as those cases deal with lawful tariffs set up and approved by the Interstate Commerce Commission—The published tariff in this case at best is legal as distinguished from being lawful.

■ The general practice among railroads is to interchange carload traffic in accordance with agreements between the delivering and receiving lines. See Kansas City Southern Railway Company v. Louisiana & Arkansas Railway Co., 213 I.C.C. 351. This is what the plaintiff and defendant railroads in this case have been doing for many years. They have adhered to Rule 7, supra, and have adopted Rule 4 to govern interchange matters among the carriers at Cincinnati. These agreements are not contrary to law or public policy and represent a binding contract among the parties to this suit.

■ Rule 4 was adopted by the Cincinnati Superintendents Committee as a special arrangement allowable under Rule 7 of the Code of Car Service Rules —Freight, of the Car Service and Per Diem Agreement, of the Association of American Railroads, in order to alter the procedures spelled out in Rule 7. It is enforcible between the parties. The plaintiff railroad can be relieved from the requirements of the rule by withdrawing as a member of the Committee which, as of this date, it has chosen not to do.

The Interstate Commerce Act has recognized the validity of such agreements and arrangements among the carriers. 49 U.S.C. § 1(13). Such contracts have been approved both by the courts and by the Commission. See United States v. Toledo, Peoria & Western Railway, 280 F.Supp. 243 (N.D.Ind.1968).

A quite similar case to the one here under consideration is Southern Railway Co. v. Louisville and Nashville Railway, passed upon by the Western District of Kentucky in 1960, 185 F.Supp. 645, affirmed by the Sixth Circuit, 289 F.2d 934 (1961). In that case Southern and the Louisville and Nashville had made a contract for the joint use of tracks to perform switching services at a General Mills plant. In an attempt to relieve itself from the contract obligation Southern published a tariff to charge the Louisville and Nashville for services which under the existing contract were performed without charge. The court in that case said:

"The Southern tariff upon which Southern relies is inapplicable to the handling of cars of L&N traffic to and from the General Mills plant, for the reason that the handling of such cars is governed by the contract between the two carrriers and General Mills, and Southern's action in attempting to publish a tariff charge was in violation of the contract and therefore wrongful. * * *"

This Court reaches the same conclusion in this case—The plaintiff railroad's published tariff is inapplicable to "no bill" cars interchanged at Cincinnati. Its suit for collection under the published tariff will be dismissed.

The attorneys for the defendants will prepare an appropriate order in accordance with this memorandum opinion, submit the same to the attorney for the plaintiff for approval as to form, and then to the Court for entry.