The CINCINNATI, NEW ORLEANS &
TEXAS PACIFIC RAILWAY CO.,
Appellant,

v.

The CHESAPEAKE AND OHIO RAIL-
WAY CO., Appellee.

The CINCINNATI, NEW ORLEANS &
TEXAS PACIFIC RAILWAY CO.,
Appellant,

v.

The BALTIMORE AND OHIO RAIL-
ROAD COMPANY, Appellee.

The CINCINNATI, NEW ORLEANS &
TEXAS PACIFIC RAILWAY CO.,
Appellant,

v.

PENN CENTRAL TRANSPORTATION
COMPANY, Appellee.

Nos. 14997–14999.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 10, 1971.

Decided April 29, 1971.

H. Merrill and Pasco, Richmond, Va. (Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., James L. Tapley and Peter S. Craig, Washington, D. C., on brief) for appellant.

Albert W. Laisy, Baltimore, Md. (Howard W. Smith, Jr., Alexandria, Va., on brief) for appellees.

Before SOBELOFF, BRYAN, and BUTZNER, Circuit Judges.

BUTZNER, Circuit Judge:

This case raises questions about the effects of published tariffs on previously existing private agreements among railroads. The district court held that where the public is not directly affected, pre-existing agreements prevail over tariffs, and that the charges due under the tariffs are not collectible. Cincinnati, N. O. & T. P. Ry. v. Chesapeake & O. Ry., 312 F.Supp. 972 (E.D.Va.1970). We reverse.

I

Seven major railroads interchange about thirty-five thousand cars a week in the Cincinnati terminal district, one of the largest rail gateways in the United States. As a consequence of the heavy traffic, switching operations are unusually complicated, and frequently the interchange of cars between connecting lines involves crossing or using the trackage of railroads not engaged in a particular transfer. To improve railroad service through uniform procedures, the companies organized the Cincinnati Superintendents Committee under informal articles of association adopted in 1932. The committee agreed on five rules which, from all that appears, have remained in effect and unchanged since 1932. Rule 4 provides there will be no return charge for cars switched in error to a member railroad.[1] The controversy leading to this case arose after the Cincinnati, New Orleans & Texas Pacific Railway Company (CNO) concluded that Rule 4 was imposing on it too great a share of the cost of handling railroad cars switched in error.

Ideally, cuts of railroad cars are interchanged accompanied by waybills for each car. In some instances, however, one or more cars in a cut are delivered ahead of their waybills. Since the missing waybills usually soon follow, the connecting line accepts these cars even though it is not obliged to do so. This practice, standard procedure for all the member railroads, saves the delivering line the expense of removing cars from a cut only to replace them when waybills appear.

Sometimes, cars having delayed waybills are tendered to the wrong connecting line. Under Rule 4, the railroad accepting delivery of misrouted cars absorbs the costs of storing and returning them. Since the line to which misrouted cars are transferred gets no part of the shipper's fee, Rule 4 effectively shifts the costs of the mistaken delivery away from the company responsible for the error. As should be apparent, Rule 4 taxes lines with reliable waybill procedures for their efficiency, and relieves the less attentive lines from the effects of their mismanagement. Nonetheless, the railroads serving Cincinnati observed Rule 4 without objection until the CNO attempted to have the rule rescinded.

---

[1.] Rule 4 provides:
"No charge will be made between railroads in Cincinnati for cars switched to them in error where the error is chargeable to railroad companies."

Rule 4 apparently was put into effect as early as 1909 by a committee of the operating vice presidents of the railroads, which had been organized in 1889 and was the predecessor to the superintendents committee.

In early 1968, the CNO announced that because of the heavy load of misrouted cars it was being forced to service, it intended to file with the ICC a tariff which would have the effect of circumventing Rule 4.[2] The proposed tariff assessed a charge of twenty dollars for the return of misrouted cars, and a subsequent modification added an assessment of five dollars a day for holding the cars while awaiting instructions from the delivering carrier.[3]

The other railroads vigorously opposed the tariff. At the April 1968 meeting of the superintendents committee, they voted six to one, the CNO alone dissenting, to retain Rule 4 as originally published, and promised the CNO improved waybilling. Despite the assurances, however, the CNO noticed no appreciable decline in misrouting during the following months.

The CNO published its tariff in September 1968 to take effect after the minimum statutory waiting period.[4] At the October 1968 meeting, the superintendents committee reaffirmed its opposition to the tariff, and several members petitioned the ICC to suspend it. The ICC, without approving the tariff, refused suspension and it became effective in November 1968.[5] Three railroads, the Chesapeake & Ohio Railway Company (C&O), the Baltimore & Ohio Railroad Company (B&O), and the Penn Central Transportation Company (Penn Central) refused to abide by the tariff. To recover the assessments due under it, the CNO began this lawsuit.

## II

■ Initially, the appellees contend that the CNO had no right to file and publish a tariff because it was bound by Rule 4 to make no charge for cars switched to it in error. They assert that Rule 4 supplements Rule 7 of the Code of Car Service Rules adopted by the Association of American Railroads.[6] Rule

---

2. The CNO says that it is not abrogating Rule 4 by its tariff because the tariff applies only to the storing and return of misrouted cars while Rule 4 prohibits assessing charges for the mistaken switching of the cars. The ordinary affairs of men are not conducted with such niceties of language, and after nearly thirty years acquiescence in Rule 4, the CNO cannot in this fashion distinguish Rule 4 out of existence.

3. In final form, the tariff read:
 "When cars, empty or loaded, are received by the CNO & TP (SRS) from its connections at Cincinnati, Ohio, without billing (see Note), such cars will upon request of the delivering carrier be returned and the CNO & TP (SRS) will assess a charge of $20.00 per connection of the carrier making the request."
 "Note—When instructions are not received within twenty-four (24) hours from time of receipt of car from connections, a hold charge of $5.00 per car will be assessed for each twenty-four (24) hours or fraction thereof thereafter."

4. Tariffs must be published for at least thirty days unless the ICC allows a shorter time. Interstate Commerce Act § 6(3) [49 U.S.C. § 6].

5. The Suspension Board stated:
 "This action does not constitute approval of the protested schedules. They may be made subject to investigation through formal complaint filed in accordance with the Commission's Rules of Practice."
 The Suspension Board's decision was affirmed by Division 2 of the Commission.

6. AAR Rule 7, Code of Car Service Rules, provides in part:
 "(A) Cars shall be considered as having been delivered to a connecting railroad when placed upon the track agreed upon and designated as the interchange track for such deliveries, accompanied or preceded by necessary data for forwarding and to insure delivery, and accepted by the car inspector of the receiving road.
 "Notwithstanding the foregoing paragraph, the receiving road shall be responsible for the cars, contents and per diem after receipt of the proper data for forwarding and to insure delivery. This responsibility shall continue as respects cars rejected by the car inspector of the receiving road until such cars have been returned to the delivering road. The effect of this paragraph may be altered by special arrangements made between the roads concerned."

7 deals with the delivery of cars for interchange, allocates responsibility for them between the connecting lines, and it authorizes railroads to alter its provisions by entering into special arrangements. In the appellees' view, Rule 4 is just such a special arrangement.

It is doubtful that Rule 7 is applicable, for it is concerned solely with the interchange of cars for which the receiving road receives a division of the joint rates. Rule 4, on the other hand, does not deal with cars that are interchanged, but with cars that are switched in error, and for them the CNO receives no share of the joint rates. Even if Rule 7 is considered applicable, it does not require a carrier to handle misrouted cars free of charge nor does it prevent a carrier from withdrawing from a "special arrangement." The basic Plan of the Association of American Railroads, under whose auspices the Code of Car Service Rules was promulgated, provides in part:

> "Nothing in this Plan shall in any way prohibit or restrain any member road from acting individually and independently of the Association or of any and all other member roads with respect to any of the matters covered hereby, and the right of individual and independent action is expressly reserved to each member road."

This clause, adopted to forestall a charge that the members of the association were violating the antitrust laws, was held to authorize a railroad to take independent action by fixing per diem charges different from those prescribed by the association's Car Service and Per Diem Agreement. Baltimore & O. R. R. v. New York, N. H. & H. R. R., 196 F.Supp. 724, 731 (S.D.N.Y.1961). We perceive no reason why the clause should not also mitigate the binding effects that the appellees attribute to AAR Rule 7 and the superintendents' Rule 4.

The appellees also contend that the CNO could not abrogate Rule 4 without totally withdrawing from the superintendents committee. The committee, it must be observed, handles many problems and operating procedures in the sprawling Cincinnati gateway, and its cooperative ventures are of assistance not only to the member railroads, but also to the shipping public which they serve. Expulsion or withdrawal of the CNO, therefore, would not serve the public interest and we would be loath to condition membership on continued adherence to Rule 4. Fortunately, however, this drastic step appears unnecessary. Nothing in the bylaws requires expulsion of a member who declines to furnish service on terms that are no longer acceptable, and the record does not disclose that any member has moved for the CNO's expulsion. Furthermore, while Rule 4 has not been submitted to the ICC for appoval,[7] had it been submitted, the Commission could not have relieved the railroads from the operation of the antitrust laws unless the superintendents' agreement complied with 49 U.S.C. § 5b(6), which provides:

"The Commission shall not approve under this section any agreement which establishes a procedure for the determination of any matter through joint consideration unless it finds that under the agreement there is accorded to each party the free and unrestrained right to take independent action either before or after any determination arrived at through such procedure."

In view of this strong expression of public policy, we have no hesitancy in concluding that the CNO's affiliation with the American Association of Railroads

7. Title 49 U.S.C. § 5b(2) provides in part:
 "Any carrier party to an agreement between or among two or more carriers relating to rates, fares, classifications, divisions, allowances, or charges (including charges between carriers and compensation paid or received for the use of facilities and equipment), or rules and regulations pertaining thereto, or procedures for the joint consideration, initiation or establishment thereof, may, under such rules and regulations as the Commission may prescribe, apply to the Commission for approval of the agreement. * * * "

and with the Cincinnati Superintendents Committee does not prohibit it from taking independent action by filing and publishing a tariff in accordance with 49 U. S.C. § 6 for the handling of misrouted cars.

### III

 The next question is whether Rule 4 affords the appellees a defense to the CNO's statutory action to recover charges under its tariff. The CNO contends that its tariff is required by the Interstate Commerce Act, and that it is enforceable despite any prior private agreement. In support of its claim that publication of its tariff was mandatory, the CNO refers to § 6(7) of the Act, which prohibits all carriers from extending "to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in [its published] tariffs."[8] The C&O, the B&O, and the Penn Central, on the other hand, argue that charges arising from routing mistakes are not mandatory tariffs, and any right to make assessments under them is

subject to pre-existing contracts. They say that § 6(5) of the Act is statutory recognition that arrangements involving transportation can be made by contract instead of by tariff where the services provided are for the benefit of railroads and not the shipping public.[9]

Section 6(7) of the Act leaves little doubt that if the storing and switching of misrouted cars is a transportation service, it can only be furnished under tariffs published in accordance with the Act.[10] Unquestionably, the statutory definition of transportation is intended to be all-encompassing where the shipping public may be affected lest the railroads, on the pretext of rendering additional service, assess the shippers extra costs not appearing in the published tariffs. See Cleveland, C. C. & St. L. Ry. v. Dettlebach, 239 U.S. 588, 594, 36 S.Ct. 177, 60 L.Ed. 453 (1916). For this reason, normal switching services to transfer cargo between connecting lines is transportation, Peoria & P. U. Ry. v. United States, 263 U.S. 528, 533, 44 S.Ct. 194, 68 L.Ed. 427 (1923), and its cost must be published either as a separate tariff or

---

8. The term "transportation" includes "cars * * * irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery * * * and transfer in transit * * * and handling of property transported." 49 U.S.C. § 1(3). See Cleveland, C.C. & St. L. Ry. v. Dettlebach, 239 U.S. 588, 594, 36 S.Ct. 177, 60 L.Ed. 453 (1916).

9. 49 U.S.C. § 6(5) provides:

"Every common carrier subject to this chapter shall also file with said Commission copies of all contracts, agreements, or arrangements, with other common carriers in relation to any traffic affected by the provisions of this chapter to which it may be a part: *Provided, however,* That the Commission, by regulations, may provide for exceptions from the requirements of this paragraph in the case of any class or classes of contracts, agreements, or arrangements, the filing of which, in its opinion, is not necessary in the public interest."

Under the proviso clause appearing in § 6(5), the Commission has relieved carriers from filing such contracts or agree-

ments except in special cases not pertinent here. See 49 C.F.R. § 1030.1.

10. 49 U.S.C. § 6(7) provides:

"No carrier, unless otherwise provided by this chapter, shall engage or participate in the transportation of passengers or property, as defined in this chapter, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariff than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs."

as an expense absorbed by the line-haul carrier, Louisiana, A. & T. Ry., 170 ICC 602, 608–09 (1931). The Supreme Court has indicated in the Office Car Cases, Louisville & N. R. R. v. United States, 282 U.S. 740, 754, 51 S.Ct. 297, 75 L.Ed. 672 (1931), and Kansas City S. Ry. v. United States, 282 U.S. 760, 764, 51 S.Ct. 304, 75 L.Ed. 684 (1931), that transportation will also be given a broad meaning with respect to services not chargeable directly to the public. Thus it appears that switching services performed solely for the benefit of other railroads are subject to the tariff provisions of the Act. Peoria & P. U. Ry., 93 ICC 3, 22 (1924).

## IV

■ Even if the Commission later determines that the tariff is not mandatory, the private agreement embodied in Rule 4 is not a sufficient defense to this suit because the tariff, so long as it is in effect, must be treated as though it has the force of law. Pennsylvania R. R. v. International Coal Mining Co., 230 U.S. 184, 197, 33 S.Ct. 893, 57 L.Ed. 1446 (1913). The Supreme Court has classified tariffs as "legal" or "lawful." A legal tariff is one which has been filed and published but which has not received ICC approval. A lawful tariff is one which has received ICC approval. The principal effect of the distinction between them is this: a shipper may apply to the ICC for reparations exacted under an unreasonable legal tariff, but the ICC cannot allow reparations of charges paid pursuant to a lawful tariff. See Arizona Grocery Co. v. Atchison, T. & S. F. Ry., 284 U.S. 370, 384, 52 S.Ct. 183, 76 L.Ed. 348 (1932). For the purposes of this case, the distinction is not significant.

The Court has held that lawful tariffs must be strictly observed regardless of any pre-existing contract a carrier has made with a shipper, Texas & P. Ry. v. Mugg & Dryden, 202 U.S. 242, 245, 26 S.Ct. 628, 50 L.Ed. 1011 (1906), or with other carriers, the Office Car Cases, Louisville & N. R. R. v. United States, 282 U.S. 740, 757–758, 51 S.Ct. 297, 75 L.Ed. 672 (1931), and Kansas City S. Ry. v. United States, 282 U.S. 760, 764, 51 S.Ct. 304, 75 L.Ed. 684 (1931). The Court has also held that legal tariffs must be strictly observed regardless of any pre-existing contract a carrier has made with a shipper. See, e. g., Kansas City S. Ry. v. C. H. Albers Comm'n Co., 223 U.S. 573, 32 S.Ct. 316, 56 L.Ed. 556 (1912), and Armour Packing Co. v. United States, 209 U.S. 56, 81, 28 S.Ct. 428, 52 L.Ed. 681 (1908). Apparently, the Court has not dealt with enforcement of a legal tariff designed to supersede a contract among carriers. Nevertheless, in our judgment, the interpretation that the Supreme Court has uniformly placed on the Act, subordinating contracts to tariffs, should also be applied here.

Congress has imposed heavy liability on railroads which fail to observe their legal tariffs. 49 U.S.C. §§ 8, 10(1), 41 (2). Moreover, the ICC is given the authority to sue in equity to enforce application of legal tariffs. 49 U.S.C. § 43. In none of these sections is there any language indicating that these tariffs should have different effects depending on whom they are assessed or on what contracts they supersede. On the contrary, §§ 41(2) and 43 refer specifically to "published tariffs" as the factor triggering the liability of the carrier. Thus, the manifest intent of Congress has been to require all legal tariffs to be observed by both parties as of the time the tariffs become effective, leaving to the person paying the tariff the right to challenge it before the ICC. See Arizona Grocery Co. v. Atchison, T. & S. F. Ry., 284 U.S. 370, 384, 52 S.Ct. 183, 76 L.Ed. 348 (1932) (dictum).

The appellees rely principally on Southern Ry. v. Louisville & N. R. R., 185 F. Supp. 645 (W.D.Ky.1960), aff'd 289 F.2d 934 (6th Cir. 1961), for the proposition that unilateral tariff publications cannot override pre-existing agreements covering local operating matters. In that

case, the Southern and the L&N agreed to handle in alternate years the switching service on some of the Southern's trackage. The purpose of the agreement was to induce a manufacturing company, which wanted a direct hookup to both railroads, to locate a new plant next to the Southern's trackage. By alternating responsibility for switching, neither railroad would have to absorb the other's charges for switching service. Because of labor troubles, the Southern insisted on doing all the switching, and it published a tariff to cover the costs involved. The court held that the "Southern's action in attempting to publish a tariff charge was in violation of the contract and therefore wrongful." 185 F.Supp. at 653.

The *Southern* case can be distinguished on a variety of grounds.[11] Nonetheless, to the extent it subordinates published tariffs to private contracts, it is contrary to an earlier case, Chicago & E. I. Ry. v. Chicago Heights Term. Trans. R. R., 317 Ill. 65, 147 N.E. 666, 669 (1925), and we are not disposed to follow it.

## V

■ To give controlling effect to private agreements over published tariffs would obstruct the ICC's use of its suspension power. Despite the petition of the railroads opposing the CNO tariff, the Commission declined to grant suspension. To hold now that the CNO tariff

may be successfully ignored is to defeat the Commission's intention to allow the tariff to take effect. The Supreme Court has held that the federal courts may not extend the suspension power of the ICC by use of the injunctive power, Arrow Transp. Co. v. Southern Ry. Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963). By the same token, the Commission's refusal to suspend rates is also not reviewable. National Industrial Traffic League v. United States, 287 F.Supp. 129, 132 (D.D.C.1968), aff'd 393 U.S. 535, 89 S. Ct. 873, 21 L.Ed.2d 754 (1969).

Instead of pursuing the administrative remedies which the Commission expressly reserved, the railroads opposing the tariff abandoned the Commission as a forum, ignored the tariff, and awaited the inevitable suit that the CNO was required by law to file for the collection of its tariff. They cannot now relitigate the matters which they unsuccessfully pressed on the Commission in their petition for suspension. Since the district court could neither suspend the rates, *Arrow*, nor review the ICC's refusal to suspend, *National Industrial Traffic League*, it cannot achieve the same result by denying the CNO recovery of money due under its tariff.

The judgment of the district court is reversed, and this case is remanded for further proceedings to determine the amounts due the CNO under its published tariff.

11. For one, the court also held that the tariff by its terms did not apply to the switching service provided. Southern Ry. v. Louisville & N. R. R., 185 F.Supp. at 653. For another, in their negotiations, the railroads and the manufacturer considered several alternate plans before the parties settled on using the Southern's spur. Underlying the whole contract was the manufacturer's belief that both railroads would have equal access rights to

the plant gate. For this reason, the property selected for the plant site was almost unique in having direct connection with the two railroads, and the purchase price included a premium reflecting that benefit. Moreover, the statute recognizes that joint agreements over the use of spurs have a special status, 49 U.S.C. § 1(18), and the court emphasized this feature. 185 F.Supp. at 652.